TYRON LEWIS V. JOHN S. OATES.

No. A-638. Decided June 5, 1946.
(195 S. W., 2d Series, 123.)

78

*Garland Casebier,* of Fort Stockton, for petitioner.

The Court of Civil Appeals erred in holding that respondent Oates cannot assign any interest he may have or be entitled to before the making of an oil and gas lease. Fulton v. Robinson, 55 Texas 401; Morrison v. Dailey, 6 S. W. 426; Federal Royalty Co. v. State, 124 Texas 290, 77 S. W. (2d) 1021; Currie v. Harris, 142 Texas 93, 176 S. W. (2d) 302.

*Travers Crumpton,* of Fort Stockton, for respondent.

The contract here sued upon is void because it contravenes public policy. Amarillo Oil Co. v. Ranch Creek Oil & Gas Co., 271 S. W. 145; Aycock v. Braun, 66 Texas 201, 18 S. W. 500; City National Bank of Corpus Christi v. City of Corpus Christi, 233 S. W. 375.

MR. JUSTICE TAYLOR delivered the opinion of the Court.

The following statement will suffice to present and make apparent the sole question presented for decision; that is whether

John S. Oates and Tyron Lewis, on September 25, 1929, had a right under the facts to effectuate by contract the transaction they undertook to enter into on that date. Oates was then, as at all times mentioned herein, the surface owner and original awardee of 640 acres of Pecos County school land. About three years prior to the above date (January 28, 1926), Oates, as surface owner of the land and as agent of the state, leased the land for oil and gas to Pure Oil Company for a term of ten years. Thereby the company, as lessee, became the owner of the lease interests for the duration of that lease and Oates became the owner of the agency compensation payable to him by the lessee for the same duration. The lease was still in force with about seven years of its term unexpired, the state was still the owner of the entire oil and gas mineral estate in the land, and Oates was still the owner of the surface estate. No oil or gas had been produced or discovered on the land and no oil or gas operations for the production of either had been begun. Oates owned the entire surface estate, having made no sale of any part thereof; and, so far as the record discloses, the territory was unproven as to oil or gas production prospects. Tyron Lewis was desirous of buying *a permanent oil and gas royalty interest* in the land and Oates was desirous of selling *such permanent interest*. Accordingly, they undertook, by contract, to enter into a transaction to effectuate their respective desires. The means whereby they undertook to enter into the transaction, was the execution and delivery contemporaneously of two instruments bearing date, September 25, 1929, both signed by Oates, the promisor, and delivered to Lewis, the promisee. The instruments will be labeled as First Part of Proposed Mineral Conveyances, and Second Part of Proposed Mineral Conveyance, respectively. The first part, in so far as pertinent here, is as follows:

*First Part of Proposed Mineral Coveyance.*

"And the said above described land being now under an oil and gas lease * * *, it is * * * agreed that this sale is made subject to the said lease, but covers and includes 1/8th of all the oil royalty and gas rental or royalty due and to be paid *under the terms of said lease,* * * * whether covered by said original lease or not. * * * It is agreed * * * that one-eighth of the money rentals which may be paid to extend the term within which a well may be begun *under the terms of said lease* is to be paid to the said Tryon Lewis and that in the event said above described lease for any reason becomes cancelled or forfeited, then, and in that event, the lease interests and *all future rentals,* * * *

for oil, gas and mineral privileges shall be owned jointly by the respective owners of record, * * * *Lewis owning an undivided one-eighth interest* therein being in and to *all oil, gas and other minerals in and upon said land, together with a like interest in all futre rents.* * * * This sale is made for and in consideration of Ten Dollars ($10.00) and other valuable considerations, * * *.

"To Have and to Hold the above described property * * * (etc), unto the said Tryon Lewis, * * * (etc), forever, and we do hereby bind ourselves, * * * (etc), to warrant and forever defend * * * (etc)." (Italics ours.)

The second part of the proposed conveyance, in so far as pertinent here, is as follows:

### Second Part of Proposed Mineral Conveyance.

"That whereas, on the 25th day of September, 1929, John S. Oates * * * did convey * * * a 1/8th undivided interest in and to all of the minerals in and under (said land, mineral classified) * * * to Tryon Lewis, * * *; (and) the above described * * * *is involved in the present litigation of the Relinquishment Act, which gives to the landowner fifteen-sixteenths of the interest in and to the minerals in and under all school lands bearing such classification;* (and) * * * in the future the question might arise as to whether the landowner owning lands with such classification, *owns any of the minerals after a specified lease has expired,* and whether or not any mineral interest *which he had sold during the time such land is under lease,* will revert to the State *at the expiration of such lease.*

"Now, therefore, know all men by these presents: That I, John S. Oates, having sold * * * *perpetual royalty or perpetual mineral interest as shown by the above mineral deed,* do hereby agree and bind myself, my heirs * * * (etc) to protect Tryon Lewis in the interest so conveyed as above described, *in the following manner:*

"If the Supreme Court rules that all minerals under the above described section of land, shall revert to the State of Texas, at the expiration of the present lease, now in good standing, then I hereby agree and bind myself, * * * (etc) *to carry the said Tryon Lewis, * * * (etc), to the extent of the interest outlined in the above * * * mineral deed, in the sale of any future leases* on the above described land *and upon the execution of such lease or leases, the interest so conveyed in the * * * mineral deed, will again be in force and effect in * * * Tryon Lewis, * * * (etc)."* (Italics ours.)

During the seven years that then remained of the term of the lease (executed in 1926), the only income from the State's mineral estate in the land was a leasing income. This was paid to Oates by the lessee company and Oates in turn paid to Lewis his pro rata part of the income. No question ever arose between them concerning the income from that lease. Such income was property which Oates, by leasing the land could lawfully acquire, and was assignable. On January 28, 1936, upon expiration of the first lease, Oates executed a second lease of the land to the same lessee for a ten-year term. While this was the second lease, it was, in relation to the purported conveyance the parties were undertaking to make, the *first* lease made after the purported sale of the permanent royalty interest. Oates did not pay over to Lewis any part of the income received by him under the *first future* lease. After it had run for about eight years Lewis, on September 11, 1944, filed suit in trespass to try title against Oates to establish, under the above transaction, a perpetual royalty interest *in future leases,* and to recover moneys paid over to Oates by the lessee under the first future lease. The case was tried without a jury. The above instruments were received in evidence. The testimony of Oates, Lewis and other witnesses was heard. The following additional facts were stipulated by the parties upon the trial, some of which have already been stated:

"That the land * * * has been awarded to John S. Oates by the state * * * as mineral classified lands; * * * that it is unpatented, and that * * * Oates constitutes common source of title; that both parties claim under him, but that such statement is not an admission of title in either party; that by instrument dated April 20, 1926, Oates, as agent for the state * * *, executed and delivered to Pure Oil Company an oil and gas lease covering the land * * *. Subsequently and *during the time * * * the lease was in effect,* * * * Oates * * * executed and delivered to Lewis an instrument (mineral deed dated September 25, 1929) purporting to convey an undivided one-eighth interest in and to all of the oil, gas and other minerals in and under the land in suit, subject to the said lease, * * *. That *contemporaneously* with the execution and delivery (thereof) * * * Oates executed and delivered to Lewis a *purported contract with reference to the * * * mineral conveyance,* * * *. That *subsequent* to the execution and delivery of * * * (the instruments) * * *, the oil and gas lease in favor of the Pure Oil Company expired by its own terms, and *no oil or gas was ever produced under same.* That thereafter (January 28, 1936), Oates, * * * as agent for the state, executed and delivered to Pure Oil Company * * * an oil, gas and mineral

lease * * * covering the land in suit * * * *and neither oil nor gas has been produced from the premises under the terms of this last-mentioned lease, * * *.*"

Lewis testified that in the transaction between him and Oates they were undertaking "to perpetuate an oil and gas rental." The ruling of the Supreme Court in Greene v. Robison (1928), 117 Texas 516, 8 S. W. (2d) 655, and that of the trial court in Empire Gas & Guel Co. v. State, 121 Texas 138, 47 S. W. (2d) 265, 267, was pending on appeal. The judgment of the trial court in Lamar v. Garner (Com. App.), 121 Texas 502, 50 S. W. (2d) 769, 773, was pending also. The decisions of the courts in those cases stood in the way of Oates and Lewis in effectuating their mutual desire in regard to the assignment of a permanent royalty interest. They undertook nevertheless, by contract, to do so.

The trial court in the present case rendered judgment that Lewis take nothing by his suit (filed some fifteen years after the undertaking referred to) ; and recited as a part of the judgment that the *"purported mineral conveyance * * * is hereby declared to be, and it always has been *absolutely void and of no force and effect whatever.* * * *."* Lewis appealed direct to the Court of Civil Appeals. He was again denied the relief sued for. 188 S. W. (2d) 895. Writ of error was applied for by Lewis, and was granted, on the ground that the Court of Civil Appeals erred in its holding in effect, substantially, that Oates and Lewis had no right on September 25, 1929, to make the contract they undertook to enter into in that Oates at that time owned no *permanent* oil and gas royalty interest and could not lawfully acquire and therefore could not lawfully assign to Lewis, *such interest.* Upon further consideration we have concluded that the Court of Civil Appeals was not in error in so holding. Greene v. Robison, 117 Texas 516, 8 S. W. (2d) 655; Empire Gas & Fuel Co. v. State (Com. App.), 121 Texas 138, 47 S. W. (2d) 265, 267; Lamar v. Garner 121 Texas 502, 50 S. W. (2d) 769, 773.

The precise question of whether under the present facts the right to effectuate, by contract, the assignment of a permanent oil and gas royalty interest in public free school land (mineral classified) has not been directly decided by this Court. It has been decided upon principle in the cases cited, as will subsequently appear. The following additional cases, cited chronologically rather than in the order either of their pointedness or

importance, sustain (some by analogy, some directly) the conclusion reached: McDonald v. Dees, et al (El Paso Ct. Civ. App.), 15 S. W. (2d) 1075, no appeal from decision of Court of Civil Appeals; Colquitt v. Gulf Production Co. (Com. App.), 52 S. W. (2d) 235; Sheffield, Tax Col. (St. Interv.), v. Hogg et al, 124 Texas 290, 77 S. W. (2d) 1021; Magnolia Petroleum Co. v. Walker, 125 Texas 430, 83 S. W. (2d) 929, (cert. den., 296 U. S. 623, 56 S. Ct. 144, 80 L. Ed. 442); Wintermann v. McDonald, Land Comm'r., 129 Texas 275, 102 S. W. (2d) 167; Shell Petroleum Corp. v. Tippett, (Austin, Ct. Civ. App., wr. ref.), 103 S. W. (2d) 448; Humble Oil & Ref. Co. v. Lloyd, (wr. ref.), 108 S. W. (2d) 213; Tennant v. Dunn, 130 Texas 285, 110 S. W. (2d) 53; Stanolind Oil & Gas Co. v. Cerf. (wr. ref.), 110 S. W. (2d) 177; Short et al v. W. T. Carter & Bro. et al., 133 Texas 202, 126 S. W. (2d) 953; Allison v. Stanolind Oil Co., 133 Texas 540, 129 S. W. (2d) 267; Navarro Oil Co. v. Cross (Com. App.), 139 Texas 272, 162 S. W. (2d) 677; Colden v. Alexander et al, 141 Texas 134, 171 S. W. (2d) 328; State v. Magnolia Petroleum Co., (San Antonio Ct. Civ. App., wr ref.), 173 S. W. (2d) 186; Avis v. First Natl. Bank, 141 Texas 489, 174 S. W. (2d) 255; Duffey v. Cross et al, (Austin Court, wr. ref. want merit), 175 S. W. (2d) 637; Cross v. Shell Oil Co., Inc. (Com. App.), 144 Texas 78, 188 S. W. (2d) 375; Lemar v. Garner (Com. App.), and Empire Gas & Fuel Co. v. State (Com. App.), both supra.

The Court of Civil Appeals, speaking through Justice Sutton, who wrote the opinion expressing both the majority and his own minority views, said:

"A majority of the court are of the opinion the contract violates public policy and cannot be enforced, but the writer is not of that opinion. The majority conclusion is based upon the proposition the defendant's incentive to co-operate with the State in making a lease would be largely or entirely taken away if he assigns any part or the whole of the compensation he is entitled to, * * *. It seems to the writer this presupposes the surface owner, if he assigns for a consideration some part or the whole of his compansation, will be derelict in the performance of his obligation and duty. It is thought the very substantial reasons applicable in the cases above referred to are not applicable here. The defendant is in no wise dependent upon the compensation provided by the construction of the Relinquishment Act. As said in Greene v. Robison, the surface owner is the mere agent of the state for the purpose of selling the oil

and gas for the highest price obtainable but not less than the minimum fixed by law. It seems to the writer the relationship existing between the State as the owner of the minerals and its agent, the surface owner, is not unlike that existing between any other owner and his agent for the sale of real estate. If the surface owner sells a part or the whole of his compensation then there are two or more persons or another interested in the development of the property and a sale of the oil and gas for the best obtainable price. * * * But for Lemar v. Garner, in the opinion of the writer, it would be difficult to distinguish this case from such cases as Pepplewell v. Buchanan, Tex. Civ. App., 204 S. W. 874 (error refused), wherein it is held a real estate agent may assign a part of his compensation—commissions— though his contract be exclusive and the contract itself not assignable. * * * It is said in Lemar v. Garner, supra, that it is not the policy of the law to favor restraints upon the alienation of property. The same might be said of the freedom and right of contract and it is a little difficult for the writer to agree the limitation put on the right of contract in this case is admissible. *If any other than the State of Texas were the defendant's principal, then there could be little doubt but that the contract would be enforced; hence* the difficulty in declining to enforce it here." (Italics ours.)

Justice Sutton prefaced the foregoing excerpt with the following statement:

"The estate first attempted to be vested was outstanding in the lessee. The rights acquired were those acquired under the terms of the then existing lease. It is said in Lemar v. Garner, supra, that 'Prior to the making of the mineral lease, the owner of the land has no right to assign or convey any mineral rights in the property.' It might be said the surface owner never acquires any estate or rights in the property but only in the moneys accruing under the terms of a lease. It is true in that case the facts were different from those under consideration here, and the language just quoted may strictly be dicta, but it is plain and unequivocal and we construe it as intended to apply to the funds collectible under the terms of a lease, and because of that statement we unanimously agree the case should be affirmed."

As our conclusion as to the correctness of the holding of the Court of Civil Appeals is predicated upon the Greene and Empire cases they will be analyzed with respect to their holdings

in regard to the legislative plan or policy of selling and developing the state's mineral estate, before stating the reasons for the conclusion reached.

The Court in the Green case took occasion to say in connection with its interpretation that "the wide difference of opinion as to the validity of the act" was due in large measure "to the confusion in the Act itself, as well as to the divergent views of the legislative authority over these lands." The Court pointed out that the state was charged with the duty of selling the lands, that is that the state as a sovereign was charged with such duty and that the people had "in their constitution provided for the sale of its vast domain of public lands"; that it provided through the legislature for their sale to homesteaders only, with the requirement of occupancy; also it provided that they should be leased for periods of years."

The Court, after setting out the Relinquishment Act and considering it in connection with the legislative enactment of 1913 and 1917 referred to in the opinion and the failure of former enactments to bring about the desired results, said:

"Therefore the very first words of the mineral act of 1919 disclosed that one of the purposes of the act was to 'promote the active cooperation of the owner of the soil.' This calls attention to the conditions that made it desirable to secure the cooperation of the owner of the soil. The state had sold the land, the soil with all that goes with it, to the purchaser thereof, and was under obligation to protect him in the use and enjoyment of what it had sold him; and this the state had failed to do. There was a dual or double ownership of the land, the surface estate and the mineral estate, each antagonistic to and conflicting with the other. There was no provision of law for the protection of the owner of the soil in his peaceable enjoyment and possession of his property. The development of an oil field on it would be disastrous to him and utterly destructive of his property.. * * * *The conditions were inimical to any effort at development, and the state was not realizing on its mineral estate in those lands.* The purpose of the act was to meet this practical situation. Indeed, the rights of possession and user of the land as a whole by both *the owner* of the *soil* and the *owner* of the *minerals,* they being joint owners of the land, are mutual and blended. As in other joint ownerships, necessarily *there must be cooperation.* If the joint owners do not cooperate confusion is bound to arise, the purposes and efforts of each are jeopardized and destroyed, and

the state suffers loss, *not only to its mineral estate, but likewise as a sovereign in the administration of justice.* The Legislature has brought about this desired result in a lawful manner by requiring the purchaser of the oil and gas to compensate the owner of the soil for the use he makes of the surface, independent of the price he pays for the minerals. He compensates said owner for the inevitable damages of oil exploration and operation. The landowner acquires no estate in the oil and gas. He simply has a right to receive the compensation from the lessee out of the lessee's production as the statute provides."

Contentions were made that the Act was unconstitutional for the reason, among others, that it made a donation to the owner of the surface estate of a part of the permanent free school fund; that it attempted to create an irrevocable agency coupled with an interest in the subject-matter and permitted a part of the school fund to be used to compensate the surface owner for his agency services. The contention was made that the Act created an agency with power to fix the conditions, times, and terms of sale of public school lands, in contravention of section 4, article 7, of the Constitution. Counsel for Greene took the position (the cause was an application for writ of mandamus filed originally in the Supreme Court) that he, as relator, was entitled to the writ only in event the respondent owned no interest in the minerals. Speaking specifically his position was that if the Act was constitutional respondent owned fifteen-sixteenths of the minerals, and Greene had no interest therein; and that for jurisdictional purposes it was necessary to determine whether the Act was constitutional. The court's response was to pass on and determine its constitutionality. In so doing the court construed all of the articles of the act together, and in connection with prior mineral sales acts, and reached the conclusion that no gift was made by the Act, and that such was not its effect; and that the legislative plan of sale was imposed *by the constitution* on the legislature in the matter of selling the state's reserved mineral oil and gas estate, and of fixing through its agent a fair price therefor; and that the plan was to utilize the surface owner's cooperation in selling the state's mineral interests; and to clothe him with authority to lease and thereby effect *for the state* the sale of the reserved estate, for a price to be paid to the state, determined by the legislature *as fixed in the Act, to be a fair price.* The Court held in this connection that under the plan there was "no fixing of title or interest in the oil and gas" in the surface owner; and further held that there was not only "no fixing of title or interest in the oil and

gas" in the surface owner under the provisions of the Relinquishment Act, but that no right thereunder passed to anyone *"until a sale or lease"* had been effected, *"according to the terms of the Act."* (Italics ours.)

The Court held that the state not only owned the mineral estate in the land, but had by its organic law devoted the income to be received from its sale and development to the cause of educating its citizenry. Particular attention was directed to the state's setting apart by provision made in its organic law certain of its lands for the support of public free schools and to the provisions, similarly made, that all sums of money coming from the sale thereof should constitute a perpetual school fund; and also to the provision whereby means should be provided by the legislature for utilizing the income for educational purposes annually, citing sections two, four and five of article seven of the constitution and copying in the opinion their respective provisions looking to this end, as well as the pertinent sections of the Relinquishment Act itself.

The Court said also that the legislative purpose in passing the Act was to prescribe a plan to meet a practical situation which had arisen from the inadequacy of prior legislation to provide a just protection for the owners of the surface estates of the mineral-classified lands which had been purchased from the state and occupied, (pursuant to the state's policy of what may be termed "homesteading,") and pointed out that the owner of the surface estate, or homesteader, and the oil operators were those primarily interested in the leasing of the lands and that both the state and the surface owners were interested in procuring the best obtainable price for the state's oil and gas mineral estate in the land; and that due to the resultant conflict between the interests of the owner of the surface estate and the owner of the mineral estate, (the home owners on one hand and the state on the other) the legislature recognized it was confronted with the task of providing such a sale plan as would procure cooperation between the owner of the surface and the owner of the minerals, that is, the home owners and the state; that in so doing the legislature named a minimum consideration upon which the state was willing to part with its mineral estate; and that having done so was desirous of obtaining (through the surface owner as its agent and intermediary, *compensation as provided by the Act*) the best price obtainable therefor by the owner. The Court said also that such interpretation of the Act was reasonable and "a correct interpretation."

The Court said:

"We are constrained to hold that a sale of these minerals for the best obtainable price by the owner of the soil, the legislature having prescribed a minimum as the terms upon which the state is willing to part with them, is valid and *in compliance with the constitution.* There can be no doubt that *the state may sell these lands* through the form of an ordinary gas and oil lease upon a royalty basis. * * * Through the owner of the soil, *as its agent,* the state *continuously offers for sale* the oil and gas under its *public free school* * * * lands * * *. We interpret the act to fix a minimum price of 10 cents per acre per annum and the value of one-sixteenth of the gross production free of cost to the state, for which the state is willing to sell the oil and gas, and the . agent is authorized to secure the highest price obtainable for *the benefit of the fund to which the land belongs;* like amounts received by the state to be paid by the purchaser to the owner of the soil. If a bonus is paid, if a larger royalty *or other amounts* are contracted for, *the state and the owner of the soil receive equally in like amounts."* (Italics ours.)

The Court said further in interpreting the Act in the particular under consideration, that the "one-sixteenth" was referred to generally throughout the Act as a royalty, and that "the fifteen-sixteenths mentioned, * * * together with the one-sixteenth, *were to be dealt with by the agent under 'and subject to the terms of this law,'* and was, of course, *'all the oil and gas in the land'."* (Italics ours.)

Another case involving also the construction of the Act pending in Court when Oates and Lewis undertook to make their contract, was Lemar v. Garner. The trial court rendered judgment in the Empire case on February 5, 1929, prior to that undertaking, and in the Lemar case on May 9, 1930, shortly thereafter. The Supreme Court held in the Empire case that, since the legislature in formulating the sale plan fixed the basis it deemed conductive to cooperation as set out in the Greene case, the surface owners could not, by contract, or otherwise, change it. The Empire and Lemar cases apparently were those referred to by Oates and Lewis as involving "the present litigation of the Relinquishment Act." Judgments in both were adverse in principle to the rights Oates and Lewis were undertaking to exercise. The opinion subsequently handed down by the El Paso Court of Civil Appeals in the Lemar case (38 S. W. (2d) 161) and by the Austin Court in the Empire case (21 S. W. (2d) 376) were likewise adverse. Both cases were later decided by the Supreme

Court. Justice Sharp, then Commissioner, spoke for the court in both cases; in stating the nature of the case:

"The lease involved herein was executed June 21, 1927, by J. H. Tippett * * * as agent of the state, to the Empire Gas & Fuel Company as lessee, and recited consideration of $16,800 cash, paid by lessee to lessor, and for the payment of royalties, to wit: one-eighth of the oil and gas produced and saved by lessee, and stipulated for a forfeiture if no well be commenced, or delay rental paid, at the rate of $1.00 per acre per annum, payable annually during the primary term of the lease and further stipulated that out of the royalties and rentals to be paid the lessor, the lessee shall pay one-sixteenth of the production to the state, as well as 10 cents per acre per annum. It was agreed that no operation had been commenced for the development of oil and gas at the time of the trial."

After stating what the judgment was that was rendered by the trial court and after directing attention to the contentions both by the parties and as amici curiae that the Relinquishment Act (Rev. St. 1925, arts. 5367-5382) authorized the state to receive only one-sixteenth of the oil and gas as a royalty and the sum of 10 cents per acre per annum as rental and that under no proper construction of the Act was the state entitled to receive one-half of any bonus or rental in excess of 10 cents per acre, the court said:

"This precise question was decided adversely to the contentions of plaintiffs in error by our Supreme Court in a well-considered and exhaustive opinion construing the Relinquishment Act. Greene v. Robison, supra. But it is vigorously contended that the Supreme Court in that case was unwarranted *in construing* the act to mean that the state was entitled to recover *any part of the bonus or delay rentals* other than the state's minimum."

The Court set out sections 51, 53 and 55 of article 3 of the constitution, as well as sections 2, 4 and 5 of article 7, as a basis of reviewing some of the important holdings in the Greene case and extracts from arguments filed in that case by numerous eminent attorneys, setting forth their respective and varying contentions; and directed particular attention to the contention in Greene v. Robison *that the constitution forbade the investment of public free school funds in the services of its agent to sell the land and that the act in so providing was "unconstitutional and void."* After discussing and quoting at length from the

Greene case, the Court further said:

"Since this case has reached the Supreme Court, the Forty-Second Legislature has enacted Senate Bill No. 310, approved March 13, 1931, which has for its purpose *the modification of the rights of the state* and the purchaser of oil and gas under the provisions of the Relinquishment Act, as construed by our Supreme Court in the case of Greene v. Robison, supra. * * *

"With these provisions of the Constitution above quoted in mind, let us analyze the provisions of the foregoing Senate Bill No. 310 with a view of ascertaining if all or any part of the act conflicts with the provisions of the Constitution. *This bill has for its purpose the modification of the rights belonging to the state by reason of the provisions of the Relinquishment Act* * * * passed in 1919. By the provisions of this act, the state constitutes the owner of the soil its agent to sell or lease * * * the oil and gas that may be thereon or therein, upon such terms and conditions as such owner may deem best, subject to the conditions that 1/16 of the gas and oil *in case of production* as royalty and 10 cents per acre per year as rental and like amounts to the owner of the soil shall be paid the state by the lessee. * * * Besides, the provisions of the act made the purchaser of land the agent of the state to secure a purchaser, and fixed his compensation definiteley therefor. What does the Legislature undertake to do under certain provisions of Senate Bill 310? It expressly undertakes to relieve the purchaser from the payment of any sum over and above the 1/16 royalty and the 10 cents per acre. This is a plain violation of section 51, article 3, of the Constitution quoted above. The Relinquishment Act constituted the buyer the agent of the state in making mineral leases and fixed his compensation under the provisions of that act, he was to receive for his services one-half of all sums over and above the royalty and 10 cents per acre rental. The provisions of Senate Bill 310 undertake *to take from the state all of the bonus and give it to the agent whose rights were fixed in the Relinquishment Act enacted in 1919*. This is in clear violation of section 53, article 3, of the Constitution above quoted." (Italics ours.)

In Wintermann v. McDonald, Land Commissioner, 129 Texas 275, 102 S. W. (2d) 167, the Court, Justice Sharp speaking, said:

"In 1931 the 42d Legislature enacted Senate Bill 310, chapter 23, article 5368a of Vernon's Annotated Texas Civil Statutes, which provided that title to fifteen-sixteenths of all minerals in

all lands described in said act is vested in the owner of the soil, and one-sixteenth of the minerals as a free royalty was reserved to the State, in case of production, and the owner was authorized to develop said minerals, and might make such leases or sales of same as he might deem proper, subject only to the reservation of the State's one-sixteenth free royalty interest. The act further authorized the owner of the land, on his behalf and as agent for the State, as to the royalty reserved by the State, to develop said minerals, to sell or lease said land for oil and gas and other mineral development and production, and shall deliver to the State a one-sixteenth part of said oil or gas * * * *free of cost. Because this act violated several provisions of the Constitution, it was declared void in toto in the case of Empire Gas & Fuel Co. v. State.*" (Italics ours.)

It is clear, as applied to the present case and facts that Oates, as the agent or intermediary through whom the state, which was " continuously" offering for sale its mineral estate in the land, was required, in making future leases (of which the 1936 lease was one) to sell same for a leasing income in the manner provided. Assume the contract undertaken was good. It follows that Oates, having sold to Lewis a part of the permanent royalty income, could not make the future lease as provided by the legislature plan. He could not, with Lewis owning a mineral estate or interest, deal on the basis of sixteen-sixteenths of the oil. He would not receive a "like amount" with the state. In event Oates sold his surface estate, the state's agent in selling a future lease could not receive as large pro rata of leasing income as Oates received. Lewis would be entitled to receive it. In other words, under the plan of Oates and Lewis, when Oates conveyed to Lewis the interest described in the purported mineral conveyance, he thereby not only rendered both himself and the successor agent *incapable of dealing* with the principal's sixteen-sixteenths of the oil and gas mineral estate, but also varied the legislative plan or policy so as to make a future lease less attractive than the former, and less likely to keep the land under lease until oil is discovered,—all detrimental to the state's organic plan to procure income in the interest of its permanent school fund. In other words, the Oates and Lewis plan tended to take away in part the inducement provided by the state's plan of keeping the land leased until the discovery of oil or gas. After discovery the sale and development of the mineral estate proceeds under rules of law and regulations with which we are not here concerned. Their plan of sale tends to make less likely the leasing of the land by the state's agent (whether Oates or another) and is

obviously detrimental to the state's interest. It reduces or tends to reduce, leasing income in that it takes away a part of the in-centive fixed to encourage leasing of the land. It sets at naught the legislative plan formulated for the purposes above indicated. According to the law as stated in the Greene case, it *ignores the basis fixed* to accomplish those purposes.

Justice Sutton found it "difficult to agree" (though he did agree on the authority of Lemar v. Garner with the majority) that the limitation placed by the Relinquishment Act on the right of contract was permissible. He said: "If any other than the State of Texas were defendant's (Oates') principal, then there could be little doubt but that the contract, (that Oates and Lewis undertook to make) would be enforced * * *."

The State is a party at interest whenever its agent sells by means of a lease under the terms of the Act the State's mineral interest in its mineral classified lands. In addition to cases cited, supra, see Colquitt v. Gulf Production Co. (Com. App.), 52 S. W. (2d) 235.

Justice Sutton agreed with the majority that Oates could assign only such interest in the mineral estate as he acquired under the terms of the first lease and that upon the expiration of that lease he had no interest to assign, quoting from the Lemar case that "prior to the making of the mineral lease the owner of land has no right to assign or convey any mineral rights in the property." He agreed along with the majority that Oates, upon expiration of the first lease, had no interest to assign other than the temporary royalty interest which arose under the terms of the first lease, the accruals from which Lewis duly received; and that Oates could assign only such interest in the mineral estate as he acquired under the terms of the first lease, quoting from the Lemar case that "prior to the making of the mineral lease the owner of land has no right to assign or convey any mineral rights in the property," and that because of the fore-going statement the present case should be affirmed.

Justice Sutton stated that while it was held in the Greene case that the surface owner was the mere agent for the state for the purpose of selling the oil and gas for the highest price obtainable (but not less than the minimum fixed by law) it seemed to him that the relation existing between the state, as the owner of the minerals, and its agent, the surface owner, was not unlike that existing between any other owner and his

agent for the sale of real estate. He pointed out that when a surface owner sells a part or the whole of his compensation, that another person becomes interested in the development of the mineral estate, but failed to take note of the fact that the only one of those persons who could make future leases of the land, the surface owner, in virtue of having sold a part of his royalty income, was less interested than before the sale in making a future lease.

It was expressly recognized, it will be noted from the above except from the Court of Civil Appeals' opinion, that the decision in the Lemar case stood in the way of the view expressed. It was stated that but for the Lemar case it would be difficult to distinguish the present case from a cited case holding that a real estate agent (for an ordinary principal) might assign a part of his compensation—commissions—although the contract was exclusive and itself not assignable. The distinction lies in the very fact that the State of Texas was Oates' principal and that as an agent of the state the method of his procedure in selling the mineral estate in the land was fixed by the legislature as provided in the Relinquishment Act. He became such an agent by the provisions of that act and not on the basis or consideration of whether he would be derelict in leasing the land or would not be. He was no more selected on that basis as an agent than he was selected on that basis by the state as an awardee of the land in question. It would have been awarded to him whether saint or sinner in his method of dealing. Likewise Oates became the surface owner and agent of the state without regard to whether he would be derelict in his duty or whether he would not be derelict. The land was awarded to him pursuant to the state's homesteading policy and the state, in selling through him its mineral estate, protected him in the enjoyment of his surface estate and compensated him on the basis fixed by the legislature in the Relinquishment Act. He and Lewis could not, by contract, fix another basis of sale. The attempt to do so was void. Greene v. Robison; Empire Gas & Fuel Co. v. State; Lemar v. Garner, all supra.

It is stated in the Lemar case that "there is nothing in the Relinquishment Act that expressly prohibits the severance and separate assignment by the surface owner of the payments to him and that the mineral leases there in controversy were for a certain period of time and were executed by the owner of the soil." In holding the severed mineral interest to be assignable the Court pointed out that "the rule is well established that it is not

the policy of the law of this state to favor restraints upon alienation of property." In other words, as stated by Court, the share of the royalties and bonuses derived from the leases executed by the surface owner, *had become property rights* "during the period of time for which the lease runs." There is no inconsistency between the foregoing statement in regard to the assignability of the property right in question and the subsequent statement which the Court was careful to make that "prior to the making of the mineral lease, the owner of the land has no right to assign or convey any mineral rights in the property."

The trial court denied Lewis the relief sought by him and correctly stated in his judgment that the "purported mineral conveyance * * * is hereby declared to be and it always has been absolutely void and of no force and effect whatever * * *." We agree with the judgment of the trial court. The purported contract was, for reasons pointed out above, contrary to public policy.

Another reason, analogous in nature, which strengthens this conclusion stems from the general rule that it is contrary to public policy for certain classes of public servants to assign their unearned salary. National Bank of El Paso v. Fink, 86 Texas 803, 24 S. W. 256. In many jurisdictions that rule has been extended so as to forbid the assignment by a receiver, executor, or other fiduciary of expected fees or unascertained and unliquidated commissions to be earned by the performance of the duties of the trust. In re Worthington, 141 N. Y. 9, 35 N. E. 929, 23 L. R. A. 97; In re King's Estate, 110 Mich., 203, 68 N. W. 154; In re Furness, 75 Fed. (2d) 965; Fischer v. Liberty Nat. Bank & Trust Co. in New York, 61 Fed. (2d) 757; Lockhart v. Mittlemann, 123 Fed. (2d) 703; Downey v. Fogarty, 23 N. Y. S. (2d) 585; In re Scott, 53 Fed. (2d) 89; Thompson v. Interborough Rapid Transit Co., 96 N. Y. S. 416; 6 C. J. S. 1069, Sec. 22; 5 C.J. 874, Sec. 43. The rule, thus extended, is applicable in this case.

It is therefore ordered that its judgment affirming that of the trial court be, and it is, hereby affirmed.

Opinion delivered June 5, 1946.

Associate Justice Smedley did not participate in the decision of this case.