# MAY, 1949

CURTIS E. NORMAN ET AL V. BASCOM GILES, COMMISSIONER OF GENERAL LAND OFFICE.

No. A-1952. Decided March 2, 1949.
Rehearing overruled May 4, 1949.
(219 S. W., 2d Series, 678.)

22

*Small & Small and C. C. Small, Jr.,* of Austin, for relators.

*Price Daniel,* Attorney General, and *Robert W. Spence,* Assistant Attorney General, for respondent.

Mr. Justice Garwood delivered the opinion of the Court.

This is an original mandamus proceeding by relators, as surface owners of a 140-acre tract of what was formerly surveyed public free school land in Crane County, against respondent, Commissioner of the General Land Office, to compel the latter to receive, file, and recognize as valid an oil and gas lease to Cities Service Oil Company (hereafter referred to as Cities Service lease) covering the tract mentioned and purportedly executed by relators as agents for the State under the terms of the so-called "Relinquishment Act" (Ch. 81, Acts 2nd Called Session, 36th Legislature, 1919, as amended by Ch. 38, Acts First Called Session, 37th Legislature, 1921; Arts. 5367, et seq., R. C. S. 1925), hereafter generally referred to as the Act.

In general the position of the respondent Commissioner is that the authority of relators to act as leasing agents for the

State had terminated under particular provisions of the Act (Arts. 5369-70, R. C. S.) well over a year prior to the execution of the tendered lease, because of the admitted fact that oil had then been discovered in paying quantities on land "not included in this law, and within one thousand feet of" the tract in question, and no well on the latter had been commenced "within one hundred days after" the discovery well or for that matter at any time.

At the time the land was patented to relators, the minerals were reserved to the State pursuant to the applicable statutes, but admittedly the "relinquishment Act" applies to the premises, so as to entitle relators, at least under ordinary conditions, to make leases of the oil and gas on behalf of the State as its agents. Greene v. Robison, 117 Texas 516, 8 S. W. (2d) 655. In March 1941, several years prior to the date of the tendered Cities Service lease, relators had thus executed a lease to one Billingsley which was shortly thereafter assigned to Stanolind Oil & Gas Company and will be hereafter referred to as the Stanolind lease. This lease and assignment were duly filed with and accepted by the Commissioner of the General Land Office, and who was also duly paid the State's share of the bonus money under the terms of the Act. Stanolind Oil and Gas Company thereafter duly paid delay rentals each year up to and including the year 1948, the General Land Office currently receiving and accepting its statutory portion thereof. On some undisclosed day during December, 1946, the abovementioned discovery of oil in paying quantities within one thousand feet of relators' tract was made by means of a well known as Texas American Syndicate No. 1 Nellie Tucker, but notwithstanding this discovery, neither Stanolind, which then held the lease, nor anyone else ever commenced drilling operations. To the contrary, on September 9, 1948, or well over a year after expiration of the one-hundred-day offset period following the No. 1 Nellie Tucker discovery, Stanolind Oil and Gas Company formally surrendered all its interest in the lease which, at least on its face, had still several months to run without further payment of delay rentals. Thereafter, on September 23, 1948, relators, again purporting to act as agents of the State, executed the Cities Service lease here in question. Somewhere about this latter date the facts in connection with No. 1 Nellie Tucker well evidently became known to the General Land Office and thereafter, on October 5, 1948, the respondent Commissioner made an endorsement on the General Land Office file covering relators' tract, stating that "Relinquishment Rights granted by Article 5367 R. C. S., of 1925 are terminated for failure to drill offset well in accordance with Article 5370 R. C. S. of 1925." A substantially similar endorsement was made by the

Commissioner on the same date upon the General Land Office file covering the Stanolind lease, though as stated the latter had been surrendered some time previously.

On October 20, 1948, the Cities Service lease, along with the State's portion of the bonus payment therefor, in the amount of $5,250.00, was tendered to the General Land Office pursuant to Article 5421c-2, Vernon's Ann. Civ. Stat. On the same date the respondent Commissioner refused to file the lease or accept the payment and returned both with a letter stating as his reason, that he considered "the rights, which were granted to the surface owner by virtue of Article 5367, R. C. S., to be terminated for failure to drill an offset in accordance with Article 5370, R. C. S., The Commissioner about the same time stated in writing that he considered the consideration and terms of the tendered lease to be fair.

Thereafter the Commissioner, purporting to act pursuant to Article 5371, R. C. S., which in his view authorizes him to sell to the highest bidder the oil and gas of a tract as to which there has been a forfeiture under Article 5370, joined with the School Land Board of the State of Texas in thus offering relators' tract for lease, and on December 7, 1948, bids were received from various oil companies on the basis of a three-sixteenth royalty plus cash bonuses; the highest bonus offered being $101,315.11 and several others from well known oil producing companies ranging from $75,211.00 to $14,700.00, the majority being very much larger than the cash bonus tendered only a short time earlier in connection with the Cities Service lease which the Commissioner had refused to accept.

At it will be necessary to refer further to the abovementioned statutes and certain others forming part of the Relinquishment Act, these are set out in full in a foot note[1], together with Article 5421c-2, Vernon's Ann. Civ. Stat., relating to the matter of filing in the General Land Office certified copies of leases made by the surface owner as agent under the act.

---

1. "Art. 5367. School and asylum lands.—The State hereby constitutes the owner of the soil its agent for the purposes herein named, and in consideration therefor, relinquishes and vests in the owner of the soil an undivided fifteen-sixteenths of all oil and gas which has been undeveloped and the value of the same that may be upon and within the surveyed and unsurveyed public free school land and asylum lands and portions of such surveys sold with a mineral classification or mineral reservation, subject to the terms of this law. The remaining undivided portion of said oil and gas and its value is hereby reserved for the use of and benefit of the public school fund and the several asylum funds.

"Art. 5368. Sale and lease by agent.—The owner of said land is hereby authorized to sell or lease to any person, firm or corporation the oil and gas that

In connection with Article 5370, it will be noted that the refusal of the respondent Commissioner is necessarily based on the premise that the forfeiture of rights under that article means not merely forfeiture of any mineral lease that might exist on the premises at the time of default but also forfeiture of the right of the surface owner to continue to act as the State's agent in leasing the property. The matter of a lease forfeiture

---

may be thereon or therein upon such terms and conditions as such owner may deem best, subject only to the provisions hereof, and he may have a second lien thereon to secure the payment of any sum due him. All leases and sales so made shall be assignable. No oil or gas rights shall be sold or leased hereunder for less than ten cents per acre per year plus royalty, and the lessee or purchaser shall in every case pay the State ten cents per acre per year of sales and rentals; and in case of production shall pay the State the undivided one-sixteenth of the value of the oil and gas reserved herein, and like amounts to the owner of the soil.

"Art. 5369. Offset wells.—If oil or gas should be discovered in paying quantities on land not included in this law, and within one thousand feet of land that is so included, the owner, lessee, sub-lessee, receiver or other agent in control of such land included herein, shall in good faith begin the drilling of an offset well or wells upon such land within one hundred days after the first discovery, and prosecute same with diligence to completion. Every offset well shall be drilled to the depth necessary for effective protection against undue drainage by other wells on other lands in that locality.

"Art. 5370. Failure to drill offset.—If such persons fail or refuse to begin drilling such offset wells within the time required, or to drill such offset well or wells diligently and in good faith, or to drill such wells to the depth necessary for the purpose intended, or to use the means necessary to the development of any well or wells thereon within the time required, or to drill such well drilled thereon, thereupon the relinquishment herein granted shall ipso facto terminate and the rights acquired thereunder shall likewise terminate, and the oil and gas relinquished herein shall revert to and become the property of the State's general revenue fund. When the Commissioner is sufficiently informed of the facts which so terminate such rights, he shall, on the wrapper containing the papers relating to the sale of the land, write and sign officially, words indicating such termination.

"Art. 5371. Sale of forfeited rights.—When the relinquishment granted herein and the rights acquired thereunder have been so terminated, the Commissioner shall take possession of the land and advertise the oil and gas therein for sale. All such sales shall be made at such times as the Commissioner may determine and in the manner provided for the sale of public free school land. The sale shall be made to the person, firm or corporation that will pay the highest price therefor in addition to one-eighth of the oil and gas produced or the value of the same, which shall be reserved to the public free school fund. The sum received in addition to the reserved one-eighth shall be divided equally between the General Revenue Fund and the owner of the soil, after deducting the expenses incident to the advertisement and sale. Purchasers at such sales shall begin the drilling of the necessary offset wells within sixty days after the acceptance of their offer, and the failure to do so and the failure to comply with the provisions of this law relating to the drilling of offset wells shall likewise operate as a termination of the rights acquired thereunder and the substances therein shall again be subject to sale."

"Art. 5421c-2. Mineral leases under Relinquishment Act.—No mineral lease executed by an owner or owners of land or minerals under what is commonly known as the Relinquishment Act shall be effective until a certified copy of such lease is filed in the Land Office. No such lease executed after the effective date hereof shall be binding upon the State unless it recites the actual and true consideration paid or promised therefor."

is not directly involved here, because the Stanolind lease was voluntarily surrendered, and the Cities Service lease was not made until long after the alleged forfeiture event occurred. Relators' principal grounds of attack upon respondent Commissioner's decision are, that, at least as regards relators, Articles 5370 and 5371 are unconstitutional, and that even if constitutional, Article 5370 must be construed as not forfeiting relator's agency for the failure of the lessee or holder of the Stanolind lease to perform the offset obligation of Article 5369. Appreciation of relators' contentions requires some further explanation.

■ In 1919 when the Relinquishment Act was passed, it was and had been for some years the policy of the State to sell the free school and asylum lands with full reservation to the State of the minerals and to dispose of the mineral rights by separate transactions. Usually this policy resulted in placing the surface ownership and mineral leasehold rights of the same land in different parties, which fact, together with the relatively insignificant indemnity provided the surface owner for damage by mineral development, was thought to create serious conflict between the surface and mineral owners and also to be rather ineffective in promoting adequate development of the State's minerals. Evidently as a result of these considerations the Legislature found it desirable to connect the surface owner more closely and less unprofitably with the development of the minerals and passed the Relinquishment Act in order to accomplish this purpose through empowering the surface owners to lease the oil and gas. See Greene v. Robison, supra; Empire Gas & Fuel Co. v. State, 121 Texas 138, 47 S. W. (2d) 265; Lewis v. Oates, 145 Texas 77, 195 S. W. (2d) 123, 128.

■ It will be noted that Article 5367, and certain other parts of the Act heretofore quoted, contain language which, considered alone, might seem the rough equivalent of a mineral deed from the State to the surface owner, reserving only to the grantor what is called nowadays a "non-participating" royalty of one-sixteenth and involving no payment of consideration by the grantee. The words "relinquishes", "relinquishment" and similar terms were so used in connection with a reference to the mineral estate as to suggest a true grant or conveyance of a mineral estate. At the same time the Act in express terms described the surface owner as the agent of the State with power to lease the minerals. In Greene v. Robison, supra, a party who had applied directly to the General Land Office for a mineral lease on land to which the Act was applicable, instead of leasing through the surface owner, sought to compel

the Commissioner by mandamus to make the lease despite the rights of the surface owner under the Act, claiming that the Act was unconstitutional on various grounds, especially in that it made a gift to the surface owner of minerals which Article VII, Section 2 and following, of the Constitution had reserved to the State for the benefit of the Permanent School Fund. In refusing the mandamus, this court, while declaring void those parts of the Act which purported to divert forfeited minerals or their proceeds from the Permanent School Fund to the General Revenue Fund, devoted the primary weight of its opinion to holding that the Act was intended merely to make the surface owner the agent of the State for the purpose of leasing the minerals, did not transfer any mineral estate to him and as a whole was constitutional. Obviously it follows from Greene v. Robison that any rights of the surface owner, which might be potentially terminable under the operation of Articles 5369 and 5370, are not property rights in the minerals, and that the words of Article 5370, "* * * the relinquishment herein granted shall ipso facto terminate * * *" could not refer to the loss by the surface owner of any mineral interest or estate.

■ Returning now to the contentions of relators, we cannot accept their suggestion that this court in Greene v. Robison or later decisions has already declared the unconstitutionality of Articles 5370 and 5371 in their entirety. In Empire Gas & Fuel Co. v. State, supra, the court in referring to Greene v. Robison did use these words: "The court in the foregoing case further held that articles 5370 and 5371, R. S. 1925, were clearly void, * * *." 121 Texas 138, 158, 47 S. W. (2d) 265, 272. But the continuation of the court's statement shows that it merely intended to repeat rather than interpret what was said in the earlier case, because the court immediately proceeds to quote most of the only relevant language from Greene v. Robison, which reads as follows:

"There are certain provisions of the Act, which do not affect its validity or practical operation, which are clearly void.

"In article 5370, after providing for a forfeiture for failure to drill offset wells, it is provided: 'The oil and gas relinquished herein shall revert to and become the property of the state's general revenue fund.'

"In article 5371, after providing that the oil and gas so forfeited shall be sold to the highest bidder, etc., it is provided: 'The sum received in addition to the reserved one-eighth shall be divided equally between the general revenue fund and the owner of the soil.'

"The oil and gas belong to the state for the benefit of these various funds, and their proceeds must go where the Constitution provides." 121 Texas 138, 158, 47 S. W. (2d) 265, 272.

This language does not even imply the unconstitutionality of more than those parts of the two articles which purport to divert the oil and gas or their proceeds to the General Revenue Fund. The implication, if any, is that the other parts of the articles are valid. The provisions for forfeiture and sale would seem to be important in the "practical operation of the Act", and the court said that the latter was not affected by its ruling.

Nor can we agree with relators that the unconstitutionality of all of Article 5370—in so far as it concerns relators—necessarily follows from the above quoted holding of Greene v. Robison. Relators argue that Greene v. Robison left a vacuum in Article 5370 with respect to where the forfeited agency rights— if they were forfeitable—should go; that this court cannot, without usurping legislative functions, now fill the vacuum by assigning those agency rights to the Permanent School Fund or any other fund, because the legislature evidently had the power to create the agency rights in the first instance and therefore has the power to say where they should go upon forfeiture; that accordingly the vacuum in Article 5370 must remain, and the article, being thus truncated, is unintelligible and must fall as whole. The answer to this plausible reasoning is that Greene v. Robison left no vacuum in Article 5370 with respect to the agency rights. The only words of the article to which the court refers are "the oil and gas relinquished herein shall revert to and become the property of the State's general revenue fund", and it was evidently thinking of the rights of a mineral lessee rather than of agency rights, because in the preceding part of the opinion, it had already held that the Act did not intend to relinquish any mineral estate to the surface owner and meant only to make him an agent. There would have been no point in holding the provision unconstitutional for purporting to transfer mere agency rights to a state fund, which, in the nature of things—not being a corporate entity— could hardly exercise them. The court held the provision unconstitutional, saying that "The *oil and gas* belong to the State for the benefit of these various funds, and *their proceeds* must go where the Constitution provides." On the other hand, this court has never given any inflexible interpretation to the word "relinquishment" in the Act, which would prevent that word being construed, in a proper context, as referring to the right of the surface owner to act as leasing agent of the State. In other words it is possible for us now to say that in one con-

text it refers to the right of the surface owner to act as leasing agent, and in another to the mineral estate acquired, for example, by a lessee from the agent. The part of Article 5370 just preceding the provision for reversion of "the oil and gas" to the General Revenue Fund says, "the relinquishment herein granted shall ipso facto terminate and the rights acquired thereunder shall likewise terminate." The "relinquishment" here referred to, when considered together with the rest of the Act, may properly be construed as meaning that the agency rights of the surface owner (as distinguished from property rights of the lessee or others in the oil and gas) simply ceased to exist upon default under Article 5369 and had no occasion to "revert" or otherwise pass to a fund. The further provision, "and the oil and gas relinquished herein shall revert * * *", must, we think, be taken to refer to the interest of any lessee who might be involved in the forfeiture. Such "oil and gas" could not go to the General Revenue Fund, as pretended by the Act, but in the words of Greene v. Robison above quoted, "must go where the Constitution provides." We think the court meant, as it might very reasonably have meant, that, the Constitution itself having already allocated these minerals and their proceeds to the Permanent School Fund, the Act should be treated as if the legislature intended to do the same thing. In this latter connection, it is of some interest that the caption of the Act contains no reference whatever to the General Revenue Fund.

■ As indicated by the foregoing, we cannot agree with relators' further contention that Article 5370, while conceivably permitting a forfeiture of the estate of a lessee, cannot under Greene v. Robison be taken to entail a forfeiture of the agency rights of the surface owner. Relators' theory is that the Act as passed purported to give the surface owner a fifteen-sixteenth ownership of the minerals; describing that estate as a "relinquishment"; that since Greene v. Robison held that the Act did not pass any mineral ownership, but merely made the surface owner the State's leasing agent, the surface owner acquired no "relinquishment" which could be the subject of forfeiture under Article 5370. As above indicated, we see nothing absurd or inconsistent with Greene v. Robison in thinking of the agency right itself as something "relinquished" to the surface owner in the sense of conceded or recognized. We see nothing illogical in the fact that such an agency shall be made to "ipso facto terminate" for default of the agent or the lessee or both, and consider the terms of Article 5370 to be consistent with such an interpretation. Relators seem to treat the Act as if the legislature intended to do two alternative things: (a) vest in the surface owner the ownership of a fifteen-sixteenths interest in

the oil and gas, subject to forfeiture under certain conditions, and (should that not be valid), (b) make the surface owner merely the State's leasing agent. If such were the case, and if the vesting of ownership of the minerals were held invalid, then no doubt the forfeiture provisions would also go out of the Act. But the legislature did not have any such intention. Greene v. Robison has decided what it was that the legislature intended. That decision held that the Act as a whole meant that the surface owner was made merely the leasing agent of the State. True, it did not say just what the legislature *did* mean by particular words such as "relinquishment" but, as stated, it likewise failed to say anything which should prevent us from construing Article 5370 as terminating the agency for a default under Article 5369.

Relators argue further that, since the Act gave the surface owner authority to make mineral leases for the State, and no estate in the minerals, Article 5369 should not be treated as holding him responsible for drilling an offset well, although the article says, "the owner, lessee * * * or other agent in control of such land * * * shall in good faith begin the drilling of an offset well * * * within one hundred days * * *." They refer to Lemar v. Garner (121 Texas 502, 50 S. W. (2d) 769) and Lewis v. Oates, supra, showing the more or less intangible and impermanent character of the surface owner's rights in respect to the oil and gas to be produced from valid leases he might make as agent. They point to Colquitt v. Gulf Production Co., (Tex. Com. App.) 52 S. W. (2d) 235, holding in effect that even when the surface owner makes a lease for the State, under which he benefits from the production by the terms of the Act, he yet has no such interest in the lease as will entitle him to bring an otherwise valid action to cancel it. Relators say that Articles 5369 and 5370, therefore, cannot reasonably or justly be construed to forfeit their agency in a case like the present, where the Stanolind lease made by them was in full force up until the every end of the hundred-day-offset period, during which relators could legally neither treat the lease as terminated, nor in any way do or cause the drilling of the necessary well, nor, for that matter, presume to tamper in any fashion with the lease, the State being the legal lessor. True, the obligation which Article 5369 imposes on "the owner", who does not own the minerals, to drill, does seem peculiar when considered alone, and it would certainly have been reasonable for the legislature to provide that offset obligations should rest only upon the lessee, if any. But let us assume the legislature had provided in the most clear and categorical terms that the surface owner had *no* obligation to drill *but* that his agency rights should terminate,

if the lessee secured by him should fail to offset, or if, there being no lessee when the discovery well was completed, the agent did not by means of a lease, procure the commencement of a well within the one hundred days following. Such a provision likewise could not be thought unreasonable. One important object of the Act was to develop the State's minerals. If the agency of the surface owner should result in failure to drill an important offset well, whether through any fault of the agent or not, the State could very reasonably conclude that the best way to protect its own interests in such a situation was to take the matter out of the agent's hands altogether and lease the minerals directly. This might be especially important in a case where, due to prolonged absence of the surface owner from the State, or to some dispute between heirs or others over the surface ownership, no lease made by the surface owner was in existence at the time the offset was required or would likely be made within a reasonable time thereafter. Under such conditions, how would the State's interest be protected except by taking matters into its own hands? Possibly—even without any statutory obligations on the surface owner to protect the minerals—the State might maintain an action to cancel his agency, but such is at best a far less certain and satisfactory method than that which we believe it was intended to retain in the Act for the State's reasonable interest. We think Articles 5369. 5370 and 5371 should be construed together to mean that in the absence of an offset well begun within the hundred-day period, the agency of the surface owner is terminated (as well as any then existing lease being forfeited), and any lease made by the surface owner thereafter, such as the Cities Service lease in this case, is without effect, the Commissioner of the General Land Office being empowered in such an instance to follow the course he evidently is following here and lease "the oil and gas" to the highest bidder. The obligation of the "owner" in Article 5369 may thus reasonably be interpreted in the sense of a guaranty on the part of the surface owner that the offset requirements will be met. The forfeiture or termination provided in Article 5370 will apply both to the agency and any lease which may be in default. Under Article 5371, "when the relinquishment granted herein and the rights acquired thereunder have been so terminated", the Commissioner shall proceed to lease "the oil and gas" of the land in question in the manner provided in that article.

Such a construction is surely not a harsh one with respect to landowners who are well advised about their own land and about their legal rights and obligations with respect to the minerals. The precaution of inserting in leases of "Relinquish-

ment Act Lands" a proper condition or covenant for the protection of the surface owner would doubtless avoid any unfortunate consequences to him from the lessee's failure to offset. Possibly an indemnity bond of the lessee in favor of the agent individually would also be proper and practicable. In this particular case the consequences do not appear very unfortunate, since the respondent Land Commissioner is evidently in a position to lease on much more favorable terms than those of relators' Cities Service lease, and relators will, of course, share generously in the benefits, as will be the case with any other surface owner under like circumstances. And it is hard to see how our construction of the statute will work substantial injustice to surface owners of school lands generally. A diligent attention to their agency opportunities, rights, and duties is far from onerous. Even a less diligent exercise of them may yet result in very substantial benefits, such as those which relators will evidently receive in the present instance regardless of our decision. Whether or not the termination of agency rights in a case like the present works a loss of them even after the mineral lease made by the Land Commissioner shall have ceased to exist, is a question we do not here need to decide. Even if our decision should necessarily entail a permanent agency forfeiture, it would not cause us to change the conclusion reached. Such a result could be a not unreasonable exception to the policy whereby, according to Greene v. Robison, supra, "through the owner of the soil as its agent, the State *continuously* offers for sale the oil and gas under the Public Free School and Asylum lands." (Underscoring supplied.)

It is also urged that, in any event, the forfeiture of relators' agency rights did not automatically occur at the end of the last day of the offset period and could not be effective thereafter until the respondent Land Commissioner had officially endorsed "on the wrapper containing the papers relating to the sale of the land * * * words indicating such termination", pursuant to the last sentence of Article 5370; that the Cities Service lease having been executed prior to the making of the endorsement, it was the valid act of an authorized agent and therefore could not be rejected, even though actually tendered to the respondent Commissioner some days after the endorsements were made. We cannot agree with this contention.

We know of no constitutional or other reason why the Legislature could not, if it chose to do so, make the forfeiture or termination of the agency, or for that matter of the lease, occur automatically upon expiration of the offset period rather than holding it in suspense to await the mere ex parte endorsement

of the Commissioner on the General Land Office file. And the words of the statute virtually compel the conclusion that it did so provide. Article 5370 states that "the relinquishment" (which we construe as the agency) "shall ipso facto terminate" upon the failure to drill within the required period. The verb "terminate" means the same as "end", and following its grammatical subject, "relinquishment", clearly means that the latter simply ends or ceases to exist. The plain inference is that the thing terminated is not ended by the act of another, that is, the respondent Land Commissioner, but of itself. The phase "ipso facto", just preceding "terminate", confirms this idea. It harks back to the fact or event of failure to drill described at the beginning of the sentence. And the words of the last sentence of the article, "When the Commissioner is sufficiently informed of the facts which so terminate such rights, he shall * * *," still further confirm that the "facts" themselves are what do the terminating. Any possible contrary implication from the first clause of the sentence is not sufficient to change the definite meaning otherwise clearly stated, and the clause is certainly far from an express requirement that the Commissioner shall make a formal fact finding before the termination shall be effective. Being ex parte, it would serve little purpose in the way of affording a fair hearing to the surface owner or lessee. Similarly there would seem to be little practical purpose in deferring the effective date of forfeiture until the Commissioner's ex parte endorsement is made. The statute requires no notice of it to be given to the parties interested, and they are doubtless charged with notice of their own default in any event. The provision in Article 5371 that the Commissioner shall take possession of the land and advertise the oil and gas for sale "when the relinquishment granted herein and the rights acquired thereunder have been so terminated", plainly refers back to the "shall ipso facto terminate" provision in Article 5370 and not to the Commissioner's act of endorsement, which is nowhere described as the thing making the termination effective. The matter of taking possession of the land can have little bearing on the question, because it is expressly referred to as coming after the termination and throws no light on whether the latter occurs upon the Commissioner's endorsement or upon mere expiration of the offset period.

There is nothing extraordinary in the idea that the Legislature should intend an automatic termination—especially with regard to a mere agency right. The question is simply what the Legislature did intend as between that and on the other hand a termination by some official act. See Adams v. Terrell, 101 Texas 332, 107 S. W. 537; Erp v. Robison, 106 Texas 143, 155

S. W. 180. Our conclusion that the Legislature intended the automatic variety finds support in a comparison between Articles 5369-71 and the parallel provisions of an act for leasing of salt water lakes, etc., and of unsurveyed school land, passed at the same session of the Legislature at which the Relinquishment Act was adopted. See Acts 1919, 2nd Called Session. Ch. 19, p. 51, sections 9 and 12. This latter act, which made forfeiture of leases effective only upon action of the Commisisoner, said so in such plain terms as to suggest strongly that the very different terms of Articles 5370 and 5371 were indeed intended to mean something different, to wit, termination without action of the Commissioner.

Our view that relators' agency terminated by operation of the statute prior to the execution of the tendered Cities Service lease renders unnecessary any ruling on the respondent Land Commissioner's contention that such lease could in no event be effective under the terms of Article 5421c-2 heretofore quoted, until filed with the respondent on October 20, 1948, by which time respondent had already made his endorsement indicating termination of relators' rights.

■ In referring during the course of this opinion to the agency character of the rights of the surface owner with respect to the oil and gas underlying the premises, we do not of course imply that these rights are not property rights in any sense whatever of the term or that they cannot give rise to true property rights. Ownership of the surface with the agency rights conferred by the Act is a more valuable thing than ownership without them. See Hill v. Ellsworth (Tex. Com. App.) 35 S. W. (2d) 704. And, under Lemar v. Garner, supra, the surface owner who has leased the oil and gas as agent does have an assignable interest in the rentals and royalties payable to him under that lease.

The writ of mandamus is refused.

Opinion delivered March 2, 1949.

Rehearing overruled May 4, 1949.