The STATE of Texas et al., Petitioners,

v.

B. L. STANDARD et al., Respondents.

No. A–11508.

Supreme Court of Texas.

March 22, 1967.

Crawford C. Martin, Atty. Gen., J. Milton Richardson, Asst. Atty. Gen., Austin, for petitioners.

Rutledge & Rutledge, W. J. Rutledge, Jr., Abilene, for respondents.

STEAKLEY, Justice.

This cause concerns later developments in the matter of the oil and gas lease executed and delivered by B. L. Standard to Trace Mining Company which was the subject òf our decision in Standard v. Sadler, 383 S.W.2d 391 (Tex.Sup.1964). The trial below was upon summary judgment motions of the parties and that of the respondents was sustained by the trial court. This judgment was affirmed by the court of civil appeals. 401 S.W.2d 363.

The problem is novel and a somewhat lengthy review of the matters culminating in the cause at hand is necessary. The tract of land in question is escheated permanent free school land subsequently resold with the mineral estate reserved in favor of the Permanent Free School Fund. See Article 3281,[1] which provides that "All sales of escheated permanent free school lands shall be with a reservation to the State of all the minerals in the land in favor of the Permanent Free School Fund. All sums received from the leasing, mineral developments, or sale of escheated lands shall be deposited in the Permanent School Fund of Texas." The controversy in Standard v. Sadler was between the Commissioner of the General Land Office, who had executed a prior oil and gas lease of the tract to Humble Oil and Refining Company under which production of oil and gas in paying quantities was thereafter obtained, and B. L. Standard, the owner of the surface estate, who had executed a subsequent oil and gas lease on this same tract in favor of Trace Mining Company. It was there decided that under the Relinquishment Act of 1919 (Acts 36th Leg. 2nd Called Session, ch. 81, p. 249; Arts. 5367–5379) the surface owner is the statutory agent of the State for the negotiation and execution of oil and gas leases on escheated land which had been sold by the State from the Permanent Free School Fund. Our decision was announced on October 7, 1964. The opinion concluded with this statement: "We assume the Commissioner of the General Land Office will recognize the lease executed by Standard as a valid lease and that he will receive and file the certified copy thereof as required by law. Writ of mandamus will issue only if he refuses to do so." Motion for rehearing was overruled on November 18, 1964. On this same date the surface owner filed in the office of the County Clerk of Taylor County, Texas, an oil and gas lease instrument identical in all respects, including its date of execution, to the oil and gas lease originally tendered for filing with the Commissioner on March 12, 1964, and which was the subject of our decision in Standard v. Sadler, except for an added paragraph as follows:

"This lease agreement is executed in amendment of and substitution for an oil and gas lease dated February 24, 1964, by and between the same parties, identical in provisions to those stated hereinabove, recorded Volume 735, page 7 of the Deed Records of Taylor County, Texas, and covering the same land described above, solely in order to show that said lease was executed contemporaneously with and pursuant to an employment contract between B. L. Standard, the landowner, and Rutledge & Rutledge, attorneys at law, dated February 14, 1964, expressly referred to herein and made a part hereof for all proper purposes."

We will refer to the first instrument as the original lease and to the second as the amended lease. The original lease previously sought to be filed with the Commissioner of the General Land Office on March 12, 1964, was again tendered to the Commissioner for filing on November 20, 1964, together with the amended lease and the employment contract referred to and made a part of the amended lease.

On December 8, 1964, there was filed in this court on behalf of the Commissioner of the General Land Office an instrument de-

---

1. The statutory references are as they appear in Vernon's Annotated Texas Civil Statutes.

nominated as "Respondent's Motion to Stay Issuance of Writ of Mandamus," based upon the subsequently tendered amended lease and employment contract. The motion was overruled on January 20, 1965. It being made known to us that the Commissioner desired to act only under an official writ of mandamus issued by this court pursuant to our judgment in Standard v. Sadler, we issued the writ under date of January 28, 1965, embracing only the original lease; the writ commanded the Commissioner "to accept and file forthwith the certified copy of an oil and gas lease executed by B. L. Standard and wife, Dorothy M. Standard, to Trace Mining Company, a co-partnership, on the 24th day of February, 1964, and recorded in the Deed Records of Taylor County, Texas, under File No. 3096 on March 10th, 1964, tendered to you in your official capacity on or about March 11th, 1964 * * *" Upon service of the writ on the Commissioner the file date of the original lease originally tendered for filing on March 12, 1964, and that of the amended lease first tendered to him on November 20, 1964, was shown to be January 28, 1965.

On May 17, 1965, suit was instituted in the name of the State of Texas on behalf of the Permanent Free School Fund against B. L. Standard and wife, and W. J. Rutledge, Jr., W. K. Rutledge, and R. M. Rutledge, individually, and as members of the partnership of Trace Mining Company, and as members of the law firm of Rutledge and Rutledge, Respondents here, and Humble Oil and Refining Company. Multiple relief was sought: the appointment of a receiver to take possession of the mineral estate of the tract of land in controversy; termination of the right of the surface owner, B. L. Standard, to act as agent for the State for the negotiation and execution of oil and gas leases; removal of the oil and gas leases executed by the surface owner, B. L. Standard, as a cloud upon the title to the mineral estate; and an accounting from Humble Oil and Refining Company for the oil and gas produced from the mineral estate. The trial court severed the suit into two causes, one of which is the cause at hand presenting for decision the question of the validity of the instruments executed by Standard in favor of Trace Mining Company, together with the further question of whether or not the acts of Standard terminated his leasing power as the statutory agent of the State.

The basis for cancellation of the two oil and gas lease instruments urged by the State rests in certain provisions of the employment contract made a part of the amended lease by the added paragraph quoted above. As before noted, a copy of this contract was first tendered for filing in the office of the Commissioner with the amended lease on November 20, 1964, and bears the same file date of January 28, 1965. It is an agreement between the surface owner, B. L. Standard, and "W. J. Rutledge, Jr., W. K. Rutledge, and R. M. Rutledge, individually and as partners in the firm of Rutledge and Rutledge, and/or Trace Mining Company." The lessee in the two oil and gas lease instruments was Trace Mining Company, a co-partnership. The contract recites the employment of the firm of Rutledge and Rutledge as attorneys and states the further fact that they are the sole partners in Trace Mining Company. Paragraphs 3 and 5 of the employment contract are relevant here and provide:

3. "Standard agrees that the portion of lease bonus payable to him as the land owner in accordance with the provisions of Article 6367 [5367], V.A.C.S., shall be promptly repaid by him to attorneys as a part of the consideration for legal services rendered to that date hereunder. Attorneys agree that in the event the legal matters in dispute respecting which this contract is executed shall be successfully disposed of so that the oil and gas mining lease executed contemporaneously herewith shall be the sole, valid lease covering the lands described above, if such attorneys (being the sole partners in

Trace Mining Company) themselves develop the premises by drilling, Standard shall have the binding and exclusive option, in his sole opinion and discretion, to acquire not more than an undivided one-sixteenth share of the seven-eighths working interest by himself carrying and bearing the exact actual expense incident to development (excepting only the lease bonus theretofore paid) ratably attributable to the Standard interest."

\* \* \* \* \* \*

5. "The parties hereto agree for themselves and their respective heirs, successors and representatives that Standard shall be paid $500.00 per location liquidated damages for crop damages resulting from drilling the described lands; and the parties agree that if Rutledge and/or Trace Mining Company shall produce oil and/or gas upon the premises and shall have management or operation of the properties, Standard will have the option or 'first refusal' of the job as pumper in such operations."

It is the position of the State that B. L. Standard as the surface owner and agent of the State had no authority beyond executing and delivering to Trace Mining Company an oil and gas lease with the usual and accepted provisions for bonus, rents and royalties; that the amended lease with its provisions for the additional consideration to be enjoyed by Standard, particularly the option for him to purchase an undivided one-sixteenth share of the seven-eighths working interest, was invalid; that the amendment is so inextricably bound up with the original as to render the entire lease transaction of no force and effect; and that the acts of Standard constituted violations of his fiduciary obligation to the State for which reason it should be held that he is ousted as the statutory leasing agent.

It is Standard's position, as held by the court of civil appeals, that our decision in the previous proceeding was res judicata as to the validity of the lease in both its original and amended form; that the remedy of the State, in any event, is not cancellation of the lease but "to demand and recover its part or interest" in the excess consideration flowing to Standard; and that no ground for invalidating the lease is shown in the absence of allegations and proof of "bad faith or fraud" against him.

■ Standard v. Sadler posed a question of statutory construction requiring us to decide whether the Commissioner of the General Land Office or the surface owner was empowered to act as the leasing agent for the State with respect to this particular tract of land. This was the only issue drawn by the parties. The validity of the original lease between Standard and Trace Mining Company was not otherwise brought into question. The amended lease and employment contract incorporated therein were unknown to the record upon which we rendered decision and final judgment. The later filed and overruled "Motion to Stay Issuance of the Writ of Mandamus" had no adjudicatory effect upon such subsequently disclosed instruments and the agreement of the parties reflected thereby. We need not speculate upon what res judicata or stare decisis effect, if any, our judgment and writ of mandamus in Standard v. Sadler may have had with respect to the original lease, standing alone. As shown by the later acts of the parties, this instrument did not reflect the true lease contract and was never intended by them to be such. The issues now to be resolved arise out of matters whose legal effect could not have been considered or decided in the prior proceeding, and there is no basis for application of the doctrine of res judicata.

■ This brings us to the question of the validity of the actual lease between Standard and Trace Mining Company as shown by the amended lease and the employment contract. As before noted, the consideration for the oil and gas lease included three benefits flowing only to Standard, the sur-

face owner; they were (1) an option for him to acquire not more than an undivided one-sixteenth share of the seven-eighths working interest by assuming ratable development expenses; (2) an option for the job of pumper in event of successful drilling operations; and (3) a right to receive $500.00 per drilling location as liquidated damages to crops. We hold that the working interest option invalidates the lease and this renders unnecessary a consideration of the legal effect of the pumper job option and the provision for crop damages.

Articles 5367 and 5368 provide:

Article 5367—"The State hereby constitutes the owner of the soil its agent for the purposes herein named, and in consideration therefor, relinquishes and vests in the owner of the soil an undivided fifteen-sixteenths of all oil and gas which has been undeveloped and the value of the same that may be upon and within the surveyed and unsurveyed public free school land and asylum lands and portions of such surveys sold with a mineral classification or mineral reservation, subject to the terms of this law. The remaining undivided portion of said oil and gas and its value is hereby reserved for the use of and benefit of the public school fund and the several asylum funds."

Article 5368—"The owner of said land is hereby authorized to sell or lease to any person, firm or corporation the oil and gas that may be thereon or therein upon such terms and conditions as such owner may deem best, subject only to the provisions hereof, and he may have a second lien thereon to secure the payment of any sum due him. All leases and sales so made shall be assignable. No oil or gas rights shall be sold or leased hereunder for less than ten cents per acre per year plus royalty, and the lessee or purchaser shall in every case pay the State ten cents per acre per year of sales and rentals; and in case of production shall pay the State the undivided one-sixteenth of the value of

the oil and gas reserved herein, and like amounts to the owner of the soil."

In Texas Co. v. State, 154 Tex. 494, 281 S.W.2d 83 (1955) we held that a conveyance by the surface owner of the mineral estate in fee simple absolute was invalid under the powers granted the surface owner by the Relinquishment Act. We reaffirmed the well-settled rule in this State that public school lands are held in trust for the benefit of all the people of the State and are administered in the sovereign capacity of the State. State v. Magnolia Petroleum Co., 173 S.W.2d 186, 190 (Tex.Civ.App.—San Antonio 1943, writ ref'd w. o. m.) held that a consideration of the entire Relinquishment Act shows an intent that the surface owner should execute "only an ordinary commercial lease, which provides for delay rentals unless and until oil is produced in paying quantities. The surface owner as agent of the State is to have an equal rental and royalty with the State as compensation for his services as such agent and for the damage done to the surface of the land when exploration for or production of oil is begun." We had previously held in Greene v. Robison, 117 Tex. 516, 8 S.W.2d 655 (1928) that the surface owner is to receive no benefits other than those authorized by Article 5368, the statute fixing only the minimum price with the agent being "authorized to secure the highest price obtainable for the benefit of the fund to which the land belongs; like amounts received by the State to be paid by the purchaser to the owner of the soil." Id. 8 S.W.2d at 660. Lewis v. Oates, 145 Tex. 77, 195 S.W.2d 123 (1946) held that an attempted conveyance by the surface owner of a right to participate in the bonuses, rentals, and royalties payable under future leases was void and unenforceable under the statute. It was reasoned that such a transaction made future leases less attractive to the State's agent and thus tended to take away some of the inducement to keeping the land leased. The proposal, it was said, sets at naught the legislative plan for keep-

ing land leased until the discovery of oil or gas.

It is clearly implied in the decisions by this Court construing the Relinquishment Act, if not directly held, that the leasing power, of the surface owner is limited to the execution of an oil and gas lease for bonus, rental and royalty considerations not less than the statutory minimum and consistent with prevailing values. We so hold here. The strict construction of the Act followed in our decisions is in harmony with the well-settled rule recognized in Empire Gas & Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265, 272 (1932) that "[L]egislative grants of property, rights, or privileges must be construed strictly in favor of the state on grounds of public policy, and whatever is not unequivocally granted in clear and explicit terms is withheld. Any ambiguity or obscurity in the terms of the statute must operate in favor of the state." No rights can pass unless an oil and gas lease is effected in conformity with the Relinquishment Act. Cf. Caples v. Cole, 129 Tex. 370, 102 S.W.2d 173 (1937). Statutory compliance has not occurred where the surface owner has, as here, contracted for the extraordinary benefit of the working interest option which constitutes a substantial consideration in which the State does not participate. Moreover, the State should not be put to the necessity of having to demand, or sue to establish and recover, its share or interest in the benefits flowing from a lease negotiated by its agent. The interest of the State should be readily ascertainable and the proceeds paid into the school fund. The invalidity of the oil and gas lease here under review is thus apparent and the transaction cannot be stripped of its invalidating features. We cannot write a new lease for the parties. Cf. State v. Magnolia Petroleum Co., supra.

In our view, however, the facts here alleged and shown were not sufficient to support an ouster of Standard as the statutory leasing agent for the State. Standard is not charged with bad faith or fraud. His unauthorized acts invalidate the lease in question, but they do not destroy his authority to now negotiate and execute an oil and gas lease conformable to and consistent with the statutory requirements and at the most favorable price obtainable. Greene v. Robison. The only express statutory authority for forfeiture of the leasing authority of the surface owner is that provided by Article 5370, namely, failure to drill an offset well. See Norman v. Giles, 148 Tex. 21, 219 S.W.2d 678 (1949). The statute contemplates a continuing and perpetual agency unless forfeited on this statutory ground or perhaps on equitable grounds not present here such as the fraud of the agent, or his failure or inability to act. See Walker, *The Texas Relinquishment Act*, in Sw. Legal Foundation 1st Institute on Oil & Gas Law & Tax. 245, 294 (1949).

The judgments of the trial court and of the court of civil appeals are reversed. Judgment is here rendered cancelling in both its original and amended form the oil and gas lease contract executed by B. L. Standard and wife, Dorothy M. Standard, to Trace Mining Company, a co-partnership, dated February 14, 1964 and removing the lease from the records as a cloud upon the title to the mineral estate of the tract of land in question; and denying all other relief sought by the State in this severed cause.

GRIFFIN, SMITH and HAMILTON, JJ., dissent.

GRIFFIN, Justice (dissenting).

I cannot agree to the majority opinion herein. In my judgment it gives an entirely new meaning to the Relinquishment Act contrary to all previously decided cases. It puts in question the true purpose of the Act and leaves the law in a state of uncertainty and confusion as it existed prior to the decision by the Court of Greene v. Robison, 117 Tex. 516, 8 S.W.2d 655 (1928); Empire Gas & Fuel Co. v. State, 121 Tex.

138, 47 S.W.2d 265 (1938), and every later case construing the Relinquishment Act.

In order to put this case in its proper perspective, I would call attention to the fact that it was disposed of in the courts below on motion by both parties for summary judgment. The judgments below were in favor of Mr. Standard and the other respondents herein. There are no pleadings by the State that either the original lease or the amended lease was entered into in bad faith or as a subterfuge, scheme or conspiracy to avoid paying the State full consideration for its interest in the oil and gas estate. Neither are there any allegations that any of the three provisions referred to by the majority opinion were fraudulently inserted in the lease, or that the State was entitled to receive any part of these considerations.

The basis used by the majority for invalidating these leases is that the option given Mr. Standard to acquire not more than an undivided 1/16th share of the 7/8ths working interest by assuming ratable development expenses violates the provisions of the Relinquishment Act. In a discussion of this clause I will demonstrate that there is no violation of the statute.

In Mr. Standard's deposition filed herein is set forth the efforts he made to secure a lessee for this 60-acre tract of land. He states that no one would offer any price for a lease or would agree to take a lease on any consideration, because of the claim of the Land Commissioner that he alone had a leasing right and power, and the awarding by the Commissioner of a lease to Humble Oil & Refining Company.

The depositions and affidavits state that there was no effort to conceal anything about the original lease or the amended lease, and all questions would have been answered at all times. Both leases were executed on forms approved by the Land Office and both leases showed that the lessee was "Trace Mining Company, a co-partnership of 324 First National Bank Building, Abilene, Texas." Art. 5924, Vernon's Texas Civil Statutes, provides in part that no person or persons shall conduct a business under an assumed name without filing a certificate in the office of the County Clerk of the county where the principal office of such business is located, showing the true owners. Such certificate was on file in the office of the County Clerk of Taylor County in Abilene, Texas, when the original lease was tendered to the Land Commissioner for filing in March of 1964. The filing of the assumed name certificate put the public, including the Commissioner, on notice that Trace Mining Company was an assumed name used by the Rutledge firm of attorneys. Margules d/b/a Southwest Brokerage Company et al. v. Crim et al. (Tex.Civ.App., 1959), 331 S.W.2d 372, 375 (3); Cooper Cotton Co. v. First State Bank of O'Donnell et al. (Tex.Civ.App., 1931), 37 S.W.2d 805, 807. The petition for writ of mandamus was brought in behalf of "B. L. Standard and Trace Mining Company, a partnership, all residents of Taylor County, Texas." In addition to the notice provision of the statute, the address of Mr. W. J. Rutledge, Jr. of Rutledge & Rutledge, attorneys for the relators in the mandamus suit, showed the office of the firm of attorneys as "324 First National Bank Building, Abilene, Texas," the identical address of Trace Mining Company, a partnership, as shown in the two leases. These facts constituted "notice" to the Land Commissioner sufficient to cause him to make an inquiry as to the members of the partnership of Trace Mining Company, and he is charged with every fact a diligent inquiry would have disclosed. Since the Commissioner had notice of these facts, and if the Commissioner expects to rely on them to invalidate the lease, he should have raised them when the question of the validity of the lease was first determined.

The lease presented to the Commissioner for filing must have been a valid lease for this Court to issue its writ of mandamus. It is true the parties to the mandamus proceeding could not raise any *fact issues*, but all *law issues* showing the lease invalid

could have and should have been raised. Everything that was known at the time of trial of this cause could have been discovered in the mandamus proceeding had the notice received by the Commissioner been followed as the law requires. If the majority is correct in its decision that the leases are invalid *as a matter of law*, the State in this cause is prevented by direct estoppel from again raising the above facts.

All emphasis herein is that of the writer.

The State filed no affidavits controverting the facts stated above and such facts are undisputed, and in this summary judgment action must be taken as true.

If the correct rule is followed in the case at bar a judgment could not be rendered for the State. All the evidence is that this lease was executed in good faith by all the parties; that it was the only lease Mr. Standard could get due to the adverse claims of the State and Humble; and that a lease plus a suit for mandamus in this Court was necessary to overturn the Commissioner's wrongful usurpation of power. Mr. Standard's position that he had the right to lease the land for oil and gas development was upheld by our judgment in the mandamus action.

The majority opinion disposes of the plea of res judicata on the ground that the validity of the original lease was not brought into question except in the determination of whether the Land Commissioner or Mr. Standard had the power to lease the 60 acres. In order to be entitled to a determination of this point, it was incumbent upon Standard and Trace to tender a valid lease. The fact that this Court issued its writ of mandamus necessarily means the lease tendered was in all respects valid. It is elementary that this Court cannot mandamus the Commissioner to file an invalid lease. Callahan v. Giles, 137 Tex. 571, 155 S.W.2d 793, 795 (1941); Wortham v. Walker, 133 Tex. 255, 128 S.W.2d 1138, 1151 (1939); American Book Company v. Marrs, 113 Tex. 291, 253 S.W. 817, 818(1) (1922); Lowe and Archer: Injunction and Other Extraordinary Proceedings (1957), § 474, Mandamus Sec. 484, and cases there cited.

The majority opinion also says that the amended lease and the employment contract were unknown to the record upon which this Court rendered its final judgment. There are two answers to this: (1) The effect of the notice of the certificate of assumed name and the corresponding "knowledge" which would have resulted from a diligent inquiry placed these instruments before this Court. (2) In the mandamus action our judgment was not final until we had ordered the writ of mandamus to issue. The relief sought was mandamus to compel the Land Commissioner to file the tendered lease. Until that lease was filed or a mandamus issued, the cause was not at an end. The Commissioner refused to file the lease, and on January 28, 1965 this Court issued its writ of mandamus ordering the lease filed. Until that date there was no order of this Court commanding the Commissioner to file the lease. Our judgment of October 7, 1964 did not order the writ issued, but provided, "writ of mandamus will issue only if he refuse to do so." In order for relator to have the relief prayed for, a proper showing had to be made to this Court that the officers had refused to act. Additional orders of this Court were necessary before the writ would be issued. In the case at bar, this showing of failure of the Commissioner to file the lease was made by the Commissioner's "Motion to Stay Issuance of Mandamus" filed in this Court December 8, 1964. The original lease was again tendered for filing on November 18, 1964, along with the amended lease and the employment contract with attorneys Rutledge & Rutledge. In our judgment of October 7, 1964 we recognized the validity of the original lease. The filing of the Commissioner's motion to stay carried the cause over to the 1965 term. Rule 458, Texas Rules of Civil Procedure. The term of court at which our order was rendered expired December 31, 1965. Our control over the judgment came to an end *except* upon a suit

filed with sufficient and appropriate allegations to set aside such judgment.

After the adjournment of the term at which a judgment is rendered, such judgment can only be set aside or vacated by an original proceeding instituted for that purpose, setting forth equitable grounds sufficient to entitle the party to a rehearing who seeks to set aside such judgment. Federal Royalty Co. v. State, 128 Tex. 324, 98 S.W.2d 993, 996 (1936); Arrington v. Mc-Daniel, 119 Tex. 148, 25 S.W.2d 295, 298 (1930); Coleman v. Zapp, 105 Tex. 491, 151 S.W. 1040, 1042 (1912); Caliva v. Texas Construction Material Co. (Tex.Civ.App., no writ hist., 1964), 380 S.W.2d 641, 644; Hamilton v. Hamilton (Tex.Civ.App., 1956), 292 S.W.2d 674, 676.

No such action has ever been filed, and in the present case no attempt was made to set aside our judgment declaring the original lease to be valid and no allegations were made justifying such action. It is fundamental and requires no citation of authority that once a court has acquired jurisdiction over a cause and has rendered a judgment therein, such judgment is binding on all parties to the original litigation until set aside by proper pleadings and judgment. Because a suit is one for a mandamus does not change this rule.

At the time this Court issued its writ of mandamus, January 28, 1965, there had been filed with the clerk of this Court the original lease, the amended lease and the employment contract. All was then known about these instruments that is now known and used as the basis for the majority opinion declaring both leases void. The Land Commissioner on December 8, 1964, in the instruments filed in connection with his motion to stay issuance of mandamus alleged the provisions of the employment contract and the amended lease as grounds for cancellation of the leases. He alleged that Standard did not get the market value for the Trace Mining Company leases. The Land Commissioner alleged, "It would be an utter absurdity to hold that the Land Commissioner must file *an obviously illegal and void instrument,* the illegality being shown upon the face of the instrument." The Land Commissioner recognized that this Court still had jurisdiction of the mandamus proceeding and could change the prior judgment. He alleged, "Said copy [of the original lease] has as yet not been filed, and mandamus has not as yet issued. Hence, the Court still has jurisdiction of the case with reference to such mandamus." With all those instruments before us and with all the information this Court had or now has in this cause regarding the validity of the leases, we recognized the original lease as valid and ordered it to be filed.

If the majority is now correct in saying the provision regarding the 1⁄16th working interest is null and void as a matter of law, we were mistaken in not so holding in January, 1965. Our decision at that time would be a mistake of law, but our judgment therein should be honored until set aside in a proper proceeding.

The rule of law applicable is that a valid judgment for a plaintiff is conclusive not only as to all defenses raised in the trial and adjudicated, but also as to those defenses which might have been raised consistent with the facts necessary to sustain the judgment. Swilley v. McCain, Tex.Sup., 374 S.W.2d 871, 874 (1964); Ogletree v. Crates, Tex.Sup., 363 S.W.2d 431, 433 (1963); Long v. Martin, 116 Tex. 135, 287 S.W. 494, 495 (1926); Cleveland v. Ward, 116 Tex. 1, 285 S.W. 1063, 1070 (1923).

As to the option contained in the employment contract and incorporated by reference in the amended lease filed for record in the Land Office November 20, 1964, and on which the majority opinion rests its holding that the leases are null and void and should be cancelled, the facts show that the Land Commissioner on his own volition filed this amended lease and the employment agreement January 28, 1965.

The case of Texas Co. v. State, 154 Tex. 494, 281 S.W.2d 83 (1955), cited as authority for its action in the majority opinion,

is not in point on the question in our case. In that case the landowner purporting to act as agent for the State under the Relinquishment Act made a deed *conveying a fee simple title* to all the oil, gas and other minerals in the tract of land involved in the suit. The State filed suit to cancel this conveyance because it conveyed all of the State's title rather than leasing the oil and gas under an "ordinary" oil and gas lease. This Court held that the owner of the soil had no right under the Relinquishment Act to convey in fee simple the State's minerals, but only the right to convey by sale or lease. The Court refused to read the Relinquishment Act into that warranty deed because to do so would make a contract for the parties which they had expressly refused to make by providing:

"It is expressly understood and agreed that this instrument is to be construed as a conveyance in fee of all the oil, gas and other minerals in and under the above described tracts of land. * * * "

The same is true of the case of State v. Magnolia Petroleum Co., 173 S.W.2d 186, 190 (Tex.Civ.App., San Antonio, 1943, writ refused, w. o. m.), cited for the proposition that the surface owner could not convey the State's mineral estate in fee simple, but only by an ordinary commercial lease, which provides for delay rentals unless and until oil and gas is produced in paying quantities. Clearly, that statement of the court is not the law, for it is recognized that the statute also provides for the State to have a minimum of $\frac{1}{16}$th free royalty, and the cases recognize that the landowner may exact a bonus for the lease. The landowner could not execute a lease providing for a bonus under the majority view that State v. Magnolia limits the rights of the landowner. The language quoted by the majority from State v. Magnolia is used to distinguish a deed to a fee simple title from a lease and was not used in the context of defining what constitutes or may constitute a valid lease. The court in that case refused to rewrite the deed for a permanent interest in the minerals to conform to the Relinquishment Act. The reasons given were:

"Let us see what this would require. It would first call for a provision to the effect that the instrument was executed for and in behalf of the State of Texas, and that the Pryors were merely acting as agents. Second, that the State was retaining not a $\frac{1}{16}$th mineral interest but a $\frac{1}{16}$th royalty. Third, that only the gas and oil was sold and not the other minerals. Fourth, that until production was begun the grantee should pay to the State a rental of some amount not less than 10¢ per acre per annum. There should also be a provision that failure to pay the rental when due would terminate the lease. It is perfectly obvious that this Court cannot write all these provisions into the mineral deed. It would be to set aside the contract actually made by the parties and for the Court to write quite a different and new contract."

In the case at bar the instruments are leases and not outright conveyances of a fee simple title in the minerals. Our leases contain all the provisions the court in Magnolia said would have to be written into the deed. The Land Commissioner makes no claim these instruments conveyed the fee simple title. The forms on which our leases were executed were those approved by the Land Office for leasing oil and gas on sold state school lands. The original lease and the amended lease executed by the parties on forms approved by the General Land Office expressly provide that the Relinquishment Act is to control. The provision is as follows: "23. *This lease is issued under the provisions* of Sub. 3, Chapter 4, Title 86 of the Revised Statutes of the State of Texas, 1925, and the amendments thereto commonly known as the *Relinquishment Act, and should there be any provisions herein not in conformity with said Act, the law is recognized and understood to prevail notwithstanding anything in this lease to the contrary.*" This only rec-

ognizes the rule of law that the Act is read into a lease.

The previous court decisions have been to take out of a lease under the Relinquishment Act anything or any grant of any estate contrary to the provisions of the Act. Acting under these decided cases and using a lease form approved by the General Land Office recognizing such law, these parties set out in each lease the above quoted provision. Even if some of the provisions of the amended lease are beyond the power of the landowner to make and execute, the remedy is not to forfeit and cancel the lease but to eliminate such provisions from the lease and declare them of no force and effect. If this is done, we will have a lease in legal terms which is complete in all respects. Nothing new will have to be inserted or substituted. The majority apparently overlooks this established law and the land office approval thereof and refuses to follow a very fundamental principle of jurisprudence.

Nevels v. Harris, 129 Tex. 190, 102 S. W.2d 1046 (1937) was a usury case. In the deed of trust it was provided: "That the intention of the parties being to conform strictly to the Usury Laws now in force, any of the said contracts for interest shall be held to be subject to reduction to the amount allowed under said Usury Laws as now or hereafter construed by the courts having jurisdiction." (2nd col. p. 1048). Speaking of this provision the Court said: (7–9) "It is the rule that all parts of a contract must be given effect if it is reasonably possible to do so. It is also the rule that men are presumed to have intended to obey the law unless the contrary appears."

" *. * * If this last provision can be given effect, and, as already said, it must be given some effect if it is reasonably possible to do so, it must be held to operate to deny the note holder the right, in any event, to collect usury. In other words, it denies the note holder the right to · collect . more than the principal debt and 10 per cent. interest per annum from

the time the borrower had the use of the money until he should repay it. This is plain because this clause of the contract expressly states that it is the intention of the parties to conform strictly to the usury laws now in force, and that 'any of said contracts for interest shall be held to be subject to *reduction* to the amount allowed under said usury laws,' etc. (Emphasis ours)." Nevels v. Harris, 102 S.W.2d 1050.

To the same effect see Wallace v. D. H. Scott & Son et al., 133 Tex. 293, 127 S.W.2d 447, 450 (1939).

In Federal Mtg. Co. et al. v. Hawkins et al. (Tex.Civ.App., 1936), 95 S.W.2d 744, a series of notes and a deed of trust were held to be usurious and the Court refused to give effect to a provision that the debtor should not be called upon to pay interest in . a sum greater than 10%. The court, in refusing to give effect to this provision said:

" * * * To us this is tantamount to saying: 'We are charging usurious interest, but if anything happens, we will apply it on the contract just as if we had charged no more than 10% per annum interest thereon from the beginning.' We do not believe that any such provision purges the contract of the usury provided for therein."

This erroneous construction of that clause was overturned by the Supreme Court. In Federal Mtg. Co. v. Davis (Tex.Civ.App., 1937), 100 S.W.2d 717, the Dallas Court construed notes and deed of trust with the same provisions as in the Hawkins case in such a way as to avoid making the contract usurious. The Court said:

"An unlawful intent will not be imputed where a lawful one may just as consistently be imputed. * * * A rule of universal application is that, where a contract is capable of two interpretations, one rendering it void and the other valid, the latter will always be adopted. Texas Employers' Ins. Ass'n v. Tabor

(Tex.Com.App.) 283 S.W. 779; City of Memphis v. Browder (Tex.Com.App.) 12 S.W.2d 160, 161; 6 R.C.L. p. 839, § 229. Gleaned from authorities throughout the country, the general rule is stated in 6 R.C.L. 839, as follows: 'If a contract is of doubtful meaning, and one construction would make it legal and another illegal, the courts will adopt that construction which will not impute to the parties an intention to violate the law. Presumptions of the law are in favor of the good faith of all parties to a business transaction, and if the language of a contract is fairly susceptible of a construction or explanation which renders it valid and enforcible, according to its terms, such construction will be adopted in preference to one which brands it with illegality, and makes it possible for one to repudiate the performance of his promise while demanding full payment of the consideration to be given therefor.' Also see the same doctrine announced in the following recent cases: Banker's Life Co. v. Miller (Tex.Civ.App.) 68 S.W.2d 574, 575; Marble Sav. Bank v. Davis, 124 Tex. 560, 80 S.W.2d 298, 299; Walker v. Temple Trust Co., 124 Tex. 575, 80 S.W.2d 935, 936."

In Davis v. Federal Mtg. Co., 131 Tex. 46, 111 S.W.2d 1066 (1938), this Court expressly approved and affirmed the Court of Civil Appeals opinion without further writing.

In Fed. Mtg. Co. v. Hawkins, 131 Tex. 56, 111 S.W.2d 1062 (1938), this Court expressly disapproved the Court of Civil Appeals opinion and pointed out that the Dallas Court had correctly decided the Davis case. This Court reversed and rendered for the mortgage Company on the Dallas case as authority.

A check in Shepard's Southwestern Reporter Citations of the case of Nevel v. Harris, 129 Tex. 190, 102 S.W.2d 1046 (1937), shows that it has never been overruled or even questioned on its decision of this point of law. On the contrary it has been followed in all cases with similar provisions in the instruments construed. In the case of Patrizi v. McAninch, 153 Tex. 389, 269 S.W.2d 343 (1954), the holding in Nevels v. Harris on the point at issue was recognized as the law applicable to contracts with a similar provision. However, this Court distinguished the provision in the Patrizi case, pointing out that certain paragraphs made the contract violate the Anti-Trust Act, and these were indivisible from the rest of the contract. Also, the court pointed out that the Patrizi contract in the face of the contractual provision relied on, provided that the seller, the first party, retained any benefits that might accrue to him if it were held that the royalties were, in part, consideration for the illegal provisions. See also Temple Trust Co. v. Sewell, 133 Tex. 417, 126 S.W.2d 943, 947 (1939).

The majority cites Greene v. Robison for the proposition that the landowner is to receive no benefits other than those authorized by Art. 5368. This statement is not a correct interpretation of the law. Art. 5368 does not contain any language authorizing the landowner-agent to secure in appropriate cases a bonus payment for a lease. Therefore, according to the majority opinion he cannot ask for and secure a bonus. A bonus is permitted only by virtue of court decisions. Under the rule stated by the majority the State is necessarily the loser because the leasing agent is prevented from ever negotiating for benefits not mentioned in the act. Experience teaches that there are cases in which special provisions, not mentioned in the act and not prohibited thereby, are necessary to be inserted in the leases in order to secure production of the State's minerals.

The Relinquishment Act, which purports to grant to the owner of the soil $15/16$ths of the oil and gas and reserves a $1/16$th to the State, was vigorously attacked in the case of Greene v. Robison, 117 Tex. 516, 8 S.W.2d 655 (1928) and in Empire Gas & Fuel Co. v. State, 121 Tex. 138, 47 S.W.2d 265

(1938). In Greene v. Robison, this Court said:

"We think the act, as it says in article 5367, creates the owner of the soil the state's agent for the purposes mentioned herein. For the accomplishment of those purposes, said agent is authorized, 'to sell or lease * * * the oil and gas * * * *upon such terms and conditions as such owner may deem best, subject only to the provisions' of the act.* There is no vesting of title or interest in the oil and gas in the owner of the soil. No rights pass to any one until a sale or lease is effected according to the terms of the act. *What is sold, the consideration therefor, the provisions inuring to the benefit of the owner of the soil, what are the proceeds of the sale, and their application must all be determined from the act.*"

In disposing of the contention that the act was unconstitutional because of the provisions of Art. 5368 authorizing the owner of the soil, as agent for the State, to "sell or lease the oil and gas upon such terms and conditions as such owner may deem best, etc.," the court said:

"As pointed out, the act provides that the owner of the land, as agent of the state, is authorized to sell or lease the oil and gas '*upon such terms and conditions as such owner may deem best,* subject only to the provisions hereof,' and that 'no oil or gas rights shall be sold or leased hereunder for less than ten cents per acre per year plus royalty, and the lessee or purchaser shall in every case pay the state ten cents per acre per year of sales and rentals,' and one-sixteenth of the value of the oil and gas in case of production, *and 'like amounts to the owner of the soil.'* Article 5368.

"We interpret the act to fix a minimum price of 10 cents per acre per annum and the value of one-sixteenth of the gross production free of cost to the state, *for which the state is willing to sell the oil and gas,* and the agent is authorized to secure the highest price obtainable for the benefit of the fund to which the land belongs: *like amounts received by the state to be paid by the purchaser to the owner of the soil.* If a bonus is paid, if a larger royalty *or other amounts are contracted for, the state and the owner of the soil receive equally in like amounts.*

"* * * . Therefore the very first words of this Mineral Act of 1919 disclosed that one of the purposes of the act was 'to promote the active co-operation of the owner of the soil.' This calls attention to the conditions that made it desirable to secure the co-operation of the owner of the soil. *The state had sold the land, the soil with all that goes with it, to the purchaser thereof, and was under obligation to protect him in the use and enjoyment of what it had sold him; and this the state had failed to do.*

\* \* \* \* \* \*

"The Legislature has brought about this desired result in a lawful manner by requiring the purchaser of the oil and gas to compensate the owner of the soil for the use he makes of the surface, *independent of the price he pays for the minerals. He compensates said owner for the inevitable damages of oil exploration and operation. The landowner acquires no estate in the oil and gas.* He simply has a right to receive the compensation from the lessee out of the lessee's production as the statute provides.

"The payments to be made to the owner of the surface 'in lieu of all damages to the soil' *is a matter of interest primarily to the landowner and the oil operator.* It is the oil operator who injures or destroys the owner's land. But the state is also interested as a sovereign doing justice between its citizens and also as the vendor to the landowner.

"The provision that the payment of the 10 cents per acre per annum and the one-sixteenth of the production shall be '*in lieu of all damages to the soil' shows clearly that same was not regarded as a*

*part of the consideration for the sale of the oil and gas."*

In the Empire case the contention was made that the Supreme Court in Greene v. Robison was unwarranted in construing the Relinquishment Act to mean that the State was entitled *to recover* any part of the bonus, delay rentals, or royalties other than the 1/16th royalty and 10 cents per acre per annum. In overruling this contention the Court again reiterated the holding in Greene v. Robison that the 1/16th royalty and 10 cents per acre per annum was the minimum fixed by the Legislature for which the State was willing to sell the oil and gas, and the landowner was authorized to secure the highest price obtainable *to be divided one half to the State and one half to owner.* The Court quoted with approval the previous holding, "If a bonus is paid, if a larger royalty *or other amounts are contracted for,* the state and the owner of the soil receive equally in like amounts."

This construction of the Relinquishment Act to give the owner of the soil and the State each one half of any bonus, delay rentals or royalties above the minimum was again held in the case of Navarro Oil Co. v. Cross, 139 Tex. 272, 162 S.W.2d 677, 678 (1942). It was there stated that it was claimed that the above holding in Greene v. Robison was dictum. This Court said: "Some have said that holding was dictum. Be that as it may, the question was definitely set at rest by Justice Sharp in Empire Gas & Fuel Co. v. State of Texas, 121 Tex. 138, 47 S.W.2d 265, 272 (1938)." Such construction has been made by every Supreme Court case on the point since Greene v. Robison. The present case is the first to fail to recognize this rule of law and to hold *a lease invalid.* See also, Cross v. Shell Oil Co., 144 Tex. 78, 188 S.W.2d 375, 377 (1945); Lemar v. Garner, 121 Tex. 502, 50 S.W.2d 769.

The Relinquishment Act sets up a scheme or plan defining the rights of the State and the landowner. It provides in specific language when a lease may be cancelled or forfeited.

Art. 5379 covers payments to the owner of the minimum royalties and rentals, and acceptance of same by the owner shall be in lieu of all damages to the soil. Then follows general provision Arts. 5380–5382, and the latter article gives the State a first lien on the oil and gas produced upon any lease area to secure payment of all "unpaid royalty *and other sums* that may become due hereunder."

The Relinquishment Act provided that the agent was authorized to sell or lease the State's mineral interest "upon such terms and conditions as such owner may deem best, *subject only* to the provisions hereof" (provisions of Relinquishment Act). Therefore, since the Relinquishment Act does not authorize a forfeiture or cancellation of a lease executed by the landowner for any acts of Standard shown by this record, the original nor amended lease cannot be cancelled or forfeited. *The State must sue lessor and lessee for its one half of such additional benefits as it deems are due it. The burden of proof must rest on the State the same as upon any other litigant who brings a suit to cancel or forfeit any instrument.*

The majority quotes as authority for its holding a portion of the Court's opinion in the Empire Gas & Fuel Co. case, to the effect that legislative grants of property must be strictly construed in favor of the State. But the majority neglects to point out that this argument was one made by those seeking to have the Relinquishment Act declared unconstitutional because "the amount given the purchaser by the State for his services" was a pure gift of the State's property and nothing but a subterfuge for the purpose of evading the plain provisions of the Constitution. This Court had quoted with approval from Greene v. Robison, *"If a bonus is paid, if a larger royalty or other amounts are contracted for, the state and the owner of the soil receive equally in like amounts."* The Court then discusses Arts.

5370 and 5371 of the Relinquishment Act providing for a forfeiture of a lease and the case of Hatcher v. State, 125 Tex. 84, 81 S.W.2d 499, 98 A.L.R. 1213, holding certain acts of the Legislature unconstitutional. Then the Court makes the statement quoted in the majority opinion, BUT, the very next statement by the Court is:

> " * * * This act has been carefully considered in the light of the foregoing rule, and there is found no language expressing the intention of the Legislature to give the landowner all of the bonus. Under this rule, if the act is silent as to whom the bonus belongs, then it necessarily would become the property of the state. However, under the fair and reasonable construction given to the expression 'like amounts to the owner of the soil,' by the court in Greene v. Robison, *we are constrained to hold that the owner of the soil may receive one half of the bonus, and the remaining half is to be received by the state.*"

Therefore, when the quotation is considered in its context, it is authority that the provision giving discretion to the landowner to lease the oil and gas rights with the state and the landowner sharing equally in the consideration received is constitutional and was the legislative intent at the time the act was passed.

The Commissioner relies for cancellation of the lease upon four provisions, of these four the option given Standard to purchase a 1⁄16th interest out of the 7⁄8ths working interest belonging to lessees is the only contention of the Commissioner sustained by the majority opinion. The leases are not cancelled by virtue of either or all of the other three options given to Standard. I agree that the leases should not be cancelled by virtue of the option given Standard to have (1) first refusal of the job as pumper; (2) the agreement to pay $500.00 crop damages; and (3) the fact that Mr. Standard paid his attorneys his one half of the bonus as their fee for successfully prosecuting the mandamus action.

In asking for cancellation or forfeiture of the lease, the State complains of the provision in the amended lease that gave Standard the option to buy from Rutledge an undivided 1⁄16th share of the 7⁄8ths working interest by making certain payments. The provision in the employment contract and incorporated by reference in the amended lease provides in part as follows:

> " * * * Attorneys agree that in the event the legal matters in dispute respecting which this contract is executed shall be successfully disposed of so that the oil and gas mining lease executed contemporaneously herewith shall be the sole, valid lease covering the lands described above, if such attorneys (being the sole partners in Trace Mining Company) themselves develop the premises by drilling, Standard shall have the binding and exclusive option, in his sole opinion and discretion, to acquire not more than an undivided one-sixteenth share of the seven-eights working interest by himself carrying and bearing the exact actual expense incident to development (excepting only the lease bonus theretofore paid) ratably attributable to the Standard interest."

This provision covers only a part of the working interest Rutledge received from Standard by virtue of the leases executed by Standard to Trace Mining Company. No part of the working interest belongs to the State, and the State does not seek in its pleadings to recover any part of such 1⁄16th interest. There can be no question but that Mr. Standard had the right to convey the full working interest to lessee. The Relinquishment Act makes Standard the State's agent to lease this working interest and it vests such interest in the lessee as his property. There are no pleadings by the State claiming this is royalty or other compensation received by the landowner as additional consideration for the lease of the State's mineral interest. In Navarro Oil Co. v. Cross, 139 Tex. 272, 162 S.W.2d 677 (1942), the landowner received as part consideration for the lease $10,000.00 overriding roy-

alty payable out of ¼th of the oil. The State recognized this and although suit was filed for one half the bonus, no part of this overriding royalty was asked for.

The Statute, Art. 5368, after providing for the sale or lease of the State's mineral interest by the landowner, provides, "*All leases and sales so made shall be assignable*." Lemar v. Garner, supra, recognizes this fact as well as that the policy of the State is not to place restraints upon alienation of property. The Land Office form on which this lease was executed also recognizes the validity of assignments of the working interest or a part thereof in these words: "*17. If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is expressly allowed*" and other provisions not relevant to our case. In the face of the statute, the cases, the lease provisions, and the pleadings herein on which the State seeks relief, how can it be contended that the State has any right to object to this assignment of a ⅟₁₆th out of ⅞ths working interest of the oil and gas?

There is another very compelling legal reason why the leases should not be cancelled. The State accepted its part of the bonus, to-wit, $5.00 per acre at the time the certified copies of the leases and employment contract were filed in the Land Office. The State has kept this consideration and has not offered to return it. In discussing this fundamental legal proposition, this Court in the case of the Texas Company v. State, 154 Tex. 494, 281 S.W.2d 83, 91 (1955) said:

"* * * Thus it is held that one seeking a cancellation of an instrument, with certain exceptions not pertinent here, must restore the original status; he cannot repudiate the instrument and retain the benefits received thereunder. Gibson v. Lancaster, 90 Tex. 540, 39 S.W. 1078; 7 Tex.Jur., Cancellation of Instruments, § 46, p. 958, et seq. In Black on Rescission and Cancellation, Second Edition, Vol. 3, § 616, p. 1482, it is said: ' * * * it is necessary that a party seeking a rescis-

sion should offer or tender a restoration to the other and that the court, if appealed to, should be able to accomplish that result by its judgment or decree.' "

In Anderson, Clayton & Co. v. State ex rel. Allred, 122 Tex. 530, 62 S.W.2d 107, the court said:

"But the authorities sustain the further rule that, where a state voluntarily files a suit and submits its rights for judicial determination, it will be bound thereby, and the defense will be entitled to plead and prove all matters properly defensive. This includes the right to make any defense by answer or cross-complaint germane to the matter in controversy. Gunter v. Atlantic Coast Line Railroad Co., supra [200 U.S. 273, 26 S.Ct. 252, 50 L.Ed. 477]; Clark v. Barnard, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780; State v. Kilburn et al., 81 Conn. 9, 69 A. 1028, 129 Am.St.Rep. 205; State v. Zanco's Heirs, 18 Tex.Civ. App. 127, 44 S.W. 527 (writ of error denied); 25 R.C.L. § 46, p. 411."

See also State v. Stanolind Oil & Gas Co. (Tex.Civ.App., 1945), 190 S.W.2d 510, 512, writ refused.

Judge Neill in the case of State v. Cloudt (Tex.Civ.App., 1904), 84 S.W. 415, writ denied, expressed the doctrine excellently when he said:

"* * * When a state appears as a party to a suit, she voluntarily casts off the robes of her sovereignty, and stands before the bar of a court of her own creation in the same attitude as an individual litigant; and her rights are determined and fixed by the same principles of law and equity, and a judgment for or against her must be given the same effect as would have been given it had it been rendered in a case between private individuals."

The State has not tendered the consideration it received for the leases and therefore cannot have the relief it seeks. The State stands in the same position as any other litigant.

**164**

In the case at bar this Court should follow the above fundamental rules and give these leases a construction that would uphold their validity. Especially is this true in the state of the pleadings filed by the Commissioner in this cause. He alleges no bad faith, no fraud, no overreaching, no subterfuge, no conspiracy. He does not allege that any or all of the provisions constituted additional consideration to the Standards and he seeks no recovery of any part thereof. The record is void of any such proof.

I would uphold the leases and affirm the Court of Civil Appeals judgment.

SMITH and HAMILTON, JJ., join in this dissent.