Thomas SUMMERS et ux., Appellants,

v.

SKILLERN & SONS, INC., Appellee.

No. 4207.

Court of Civil Appeals of Texas.

Waco.

June 25, 1964.

Rehearing Denied July 23, 1964.

---

Harris, Ball & Davis, Arlington, for appellants.

Strasburger, Price, Kelton, Miller & Martin, Philip L. Kelton and Wilson Herndon, Dallas, for appellee.

TIREY, Justice.

This cause (non jury) is an appeal from an order sustaining the plea of privilege of the defendant, Skillern & Sons, Inc., to be sued in Dallas County, the alleged place of its residence. Appellants, plaintiffs, sought to recover damages for the wrongful imprisonment of his wife, Paula Jean Summers, age twenty. Appellee seasonably filed its plea of privilege to be sued in Dallas County, the county of its residence, and plaintiffs filed their controverting affidavit and alleged substantially that venue lies in Tarrant County by virtue of the provisions of subdivision 23 of Art. 1995, Vernon's Ann.Tex.St., which provides in part:

> "Suits against a private corporation, association, or joint stock company may be brought in the county in which its principal office is situated; or in the county in which the cause of action or part thereof arose; or in the county in which the plaintiff resided at the time *the cause of action or part thereof arose, provided such corporation, association or company has an agency or representative in such county;* * *"
> (emphasis added)

Plaintiffs further allege that this action was properly brought in Tarrant County because it is a suit against a private corporation, and that said corporation has a representative or agency in Tarrant County, and that plaintiffs resided in Tarrant County at the time the cause of action, or a part thereof, arose. Testimony was tendered to the effect that appellants were husband and wife and lived in Tarrant County, and that the wife was employed by defendant at Station 39, in Arlington's Park Plaza, Arlington, Tarrant County, Texas; that defendant is incorporated; that in late December 1961, the wife was instructed by her manager to go to a store meeting in Dallas; that she was told the meeting was to be held at Skillern's warehouse in Dallas, which is a frequent and common thing for such meetings to be held; that such meeting was actually held at Hopper and Hawkins who was employed by the defendant for the purpose of investigating or checking defendant's stores; that after his wife was taken to the office of Hopper and Hawkins; that plaintiff's wife was strapped in a chair and caused to take a lie detector test; that at the time the test was made plaintiff's wife was employed by defendant at defendant's store in Arlington, Tarrant County; that thereafter, on January 16, 1962, during plaintiff's wife's vacation, Bill Strickland (a district manager) instructed plaintiff's wife to return to the same place as before and she did to find that there awaited private investigators who locked her in a room

and forced her to remain against her will until such a time as they forced her to sign a piece of paper; that threats were made against her person and her family; that Mrs. Summers attempted at one time to leave but she was pushed down in the chair and she was then afraid to try to leave again; that because of this treatment plaintiff suffered damages from personal injury giving rise to the filing of this suit.

The judgment is assailed on one point, it is: "The court erred in sustaining the plea of privilege because appellant properly plead and proved that this is a suit against a private corporation; that appellant resided in Tarrant County at the time the cause of action, or part thereof, arose, and that appellee has and has had at all pertinent times, an agency and representative in Tarrant County; that, thereafter, this action was properly brought in Tarrant County, under the provisions of subdivision 23 of Article 1995, V.A.T.S." Appellee's counterpoint 1 is to the effect that the court correctly sustained its plea of privilege because plaintiff did not prove by a preponderance of the evidence that a cause of action arose in their favor against the defendant. We affirm the judgment of the trial court.

As we understand Mrs. Summer's testimony it is to the effect that, at the request of defendant, she made two trips to Dallas. The first trip she made in the latter part of December, 1961. This first trip seems to have been made in the afternoon and that she got home about 6:30 that night, and that she went to work the next day. The next trip was made on the 16th day of January, 1962, and with reference to this trip she testified in part:

"Q. In other words, you started your vacation and they called you to come back?

"A. Yes, sir. Bill Strickland called me at home.

*    *    *    *    *    *

"Q. Then, what did you do, what happened?

"A. He called me up and told me that the man that interviewed me a few weeks ago wanted to ask me some more questions about—about the store, about the survey, and I said, 'Well, Mr. Strickland, I'm on my vacation,' and he said, 'Well, Mrs. Summers, I'll see that you get paid for going over there on your time.' So, I went up to Skillern's Store in Park Plaza, and talked to Mr. McDonald, (her manager) and he told me, he said, 'Yes, go on over there,' he said, 'Bill Strickland just called me, and asked me, and I told him that you'd be there.' So, I went over, back over to Dallas—

"Q.—By yourself this time?

"A. No, sir, I went with a friend.

"Q. Who was the friend?

"A. Carol Sills, she was a former employee of Skillerns. So, I went in there, and I didn't see Bill Strickland, or any of the Skillern employees. He, the receptionist at the door took me back to this room, and just as I got to the door there were some men that met me and took me in a room and one locked the door, and the other one sat behind a desk and one propped a chair up in front of the door, and then they started telling me that they were private investigators, and—

"Q. Did they say who they were hired by?

"A. No, sir. They just told me they were private investigators. Then, they started threatening me, telling me they were going to pick the phone up and call the District Attorney, and—I have a little brother, I've had him for four or five years, and they told me everything about myself, and even the church I went to, my children, and they threatened to have my little brother taken away from me and they just kept on at me, and then they—one man sat down behind the desk and propped his feet

up in front of me on the desk, they had me cornered behind the desk.

"Q. Did you ever at any time try to get up and leave?

"A. Yes, sir, one time.

"Q. Were they keeping you in there—?

"A.—Yes, sir, they were—

"Q.—Without your permission?

"A. Yes, sir, they were.

"Q. And, you did try to get up and go out of the room?

"A. One time I did.

"Q. Why did you not try more often?

"A. Because I was afraid of them.

"Q. You had never seen them before in your life?

"A. No, sir.

"Q. You didn't know what on earth they were doing?

"A. (Witness indicating, 'No').

"Q. All right. Now then, from this occasion have you suffered nervousness, and nervous injuries?

"A. Well, I just—

"Q.—What injuries have you suffered?

"A. Well, right after it happened I wasn't even in good health at all, I couldn't eat, or anything. I just stayed sick all the time. For about two months I was sick, or about three I guess, because back in about April, or May, somewhere along in there I went back to work.

"Q. Were you able to work or—even if you could have gone to work, were you able to, could you have—?

"A.—No, sir, I don't believe so.

"Q. Approximately how much money were you making at the time?

"A. At Skillern's?

"Q. Yes

"A. Forty dollars, ($40.00) a week.

"Q. Then, you lost all of that income. That is, if you had been able to work whether you worked at Skillern's or not you—?

"A.—Yes, sir.

"Q. All right. Did you go see your doctor about your—?

"A.—Yes, sir, I was—my nerves, and everything until I had, I was treated for just about everything. I was, just stayed sick for about three months.

"Q. Can you describe your sickness? Was it a—?

"A. Well, it was just my nerves.

"Q. Was your stomach upset, or what? Was it that sort of thing?

"A. Well, I couldn't tell you just exactly how I—.

"Q.—You couldn't keep anything on your stomach?

"A. No, I eat. I lost about thirty-five pounds, though.

"Q. All right. Now, what doctor did you go to?

"A. John F. Bida."

■■■ Mr. Geo. B. Kelly testified to the effect that he was Secretary-Treasurer of the appellee at all times pertinent to this controversy, and that in 1962 Hopper and Hawkins were employed by appellee for the purpose of checking its individual stores, and for making any special investigations that they asked them to perform; that they asked Hopper and Hawkins in January, 1962, to take the employees of the store in question and give them a polygraph test, and that he gave these instructions to the District Manager, Bill Strickland; that he, Mr. Strickland, would have to ask the people to take this on a voluntary basis;

that he had a tremendous shortage in the store; that he told Mr. Strickland that the employees were not required to go over there, and that they must go voluntarily, but that he did not instruct Mr. Strickland to tell the employees for what purpose they were going over to Hopper and Hawkins. In Compton v. Elliott, 126 Tex. 232, 88 S.W.2d 91, we find this statement of the rule:

"(1) It is well settled that 'with the venue challenged, under proper plea, by one sued without his county, * * the burden not only to allege but to prove that the case is within one of the exceptions to the statute rests on the plaintiff.' "

Our Supreme Court has not changed the foregoing rule. We have considered the testimony tendered very carefully and we are of the view that there is no suggestion that any act or conduct contended to constitute false imprisonment was committed by anyone other than Hopper and Hawkins. We are of the further view that the record shows that the alleged acts constituting the claimed false imprisonment were solely those of Hopper and Hawkins, and they were engaged in a distinct and generally recognized employment which made them an independent contractor, and that in this instance they undertook to do a specific piece of work for the appellee, using their own means and methods without submitting themselves to control in respect to all its details, and with a method of payment which was to pay them for the specific work. We are of the view that under the testimony in this record that Hopper and Hawkins were independent contractors and not the agents of appellee, and that this view brings this cause within the rule announced by our Supreme Court in Pitchfork Land & Cattle Company v. King, 162 Tex. 331, 346 S.W. 2d 598, 603; Cunningham v. The International Railroad Co., 51 Tex. 503, 32 Am. Rep. 632. Under Compton v. Elliott, supra, the burden of proof rested upon appellants to establish their alleged cause of action. Since this hearing was before the court without a jury, and since there was no request for findings of fact, and none filed, it must be assumed that the court found that appellants failed to establish one or more of the claimed elements of their cause of action. See Smith v. Southwestern Greyhound Lines, Inc., Tex.Civ.App., 331 S.W. 2d 829, (n. w. h.) and cases cited under points (1, 2).

Accordingly, the judgment of the trial court is affirmed.