In re Lang C. MARTIN, Jr., and Ann T. Martin, Debtors.

Lang C. MARTIN, Jr., Plaintiff,

v.

BARCLAYSAMERICAN/LEASING, INC., Defendant.

Bankruptcy No. 189–10248–7.
Adv. No. 189–1042.

United States Bankruptcy Court,
N.D. Texas,
Abilene Division.

Aug. 8, 1990.

Billy W. Boone, Abilene, Tex., for Lang C. Martin, Jr.

Robert L. Jones, Crenshaw, Dupree & Milam, Lubbock, Tex., and Michael S. Haber, Smith, Gambrell & Russell, Atlanta, Ga., for Barclays.

Harvey L. Morton, Lubbock, Tex., Chapter 7 trustee.

## MEMORANDUM OF OPINION ON CONSULTING AGREEMENT

JOHN C. AKARD, Bankruptcy Judge.

BarclaysAmerican/Leasing (Barclays) objected to Debtors' claim of exemption to income received by Lang C. Martin, Jr. pursuant to a Consulting and Non–Competition Agreement. Mr. Martin brought this adversary proceeding to determine the extent and priority of the lien asserted by Barclays on the income from the consulting agreement. The Trustee-in-Bankruptcy asserted that Barclays' lien can be set aside as a preference. The court finds that such income is not exempt under Tex.Prop.Code Ann. § 42.002(8) (Vernon 1984) as current wages for personal services. Such income earned but unpaid prepetition constitutes property of the estate pursuant to § 541 of the Bankruptcy Code,[1] and Barclays' lien can be set aside by the Trustee as a preference. However, such income earned post-petition is not property of the bankruptcy estate and is subject to Barclays' lien.

### Facts

Mr. Martin, a ceramics engineer, built a ceramic tile plant in 1963 called Floramic Tile Company located in Coleman, Texas. Later the name was changed to Creative Ceramics Corporation. In 1983 Dal–Tile, Inc. owned the majority interest, Martin Brick Company[2] owned an interest and an employee of Dal–Tile owned a small interest. In May, 1983, Dal–Tile decided to close the plant. Mr. Martin wanted to keep the plant open. The Dal–Tile management agreed to keep the plant open if Martin Brick would sell them its interest in the plant and if Mr. Martin would remain as a consultant. Martin Brick sold its interest in Creative Ceramics to Dal–Tile and on June 7, 1983, Mr. Martin entered into a Consulting and Non–Competition Agreement (the Agreement) with Creative Ceramics (which was then owned by Dal–Tile). Subsequently, Creative Ceramics merged into Dal–Tile and Dal–Tile assumed the Agreement.

On August 26, 1983, Mr. Martin entered into a security agreement with Barclays which granted Barclays a lien on the Agreement as part of Mr. Martin's personal guaranty of rentals owed by Martin Brick to Barclays. Barclays perfected its lien. Barclays' U.C.C.–1 filing lapsed, and Barclays filed another U.C.C.–1 on April 18, 1989. The Debtor filed for relief under Chapter 7 of the Bankruptcy Code on the 90th day from the date of Barclays' second U.C.C. filing. On March 23, 1989, Barclays wrote Dal–Tile demanding the proceeds from the Agreement. Since that time, Dal–Tile has withheld payment of the monthly

---

1. The Bankruptcy Code is 11 U.S.C. § 101 *et seq.* References to section numbers are references to sections in the Bankruptcy Code.

2. Mr. Martin was the principal shareholder of Martin Brick Company.

**246**

consulting fees and presently holds approximately $10,000.00 which was earned prepetition. The Chapter 7 trustee consented to Mr. Martin's bringing an action on behalf of the estate for monies owing prepetition on the Agreement.

### The Agreement

In the Agreement, Creative Ceramics (and subsequently Dal–Tile) employed Mr. Martin as a consultant on "the research, development, and ultimate production of a dry press quarry tile as an independent contractor...." The Agreement ran for a period of ten years beginning July 1, 1983. The Debtor agreed to be available to Creative Ceramics' officers and department heads "at reasonable times, but not to exceed a maximum of eight (8) hours per week" on matters concerning the development and manufacture of tile and operation of the plant. He also agreed to be available to negotiate terms and conditions of contracts with others in the tile industry, to give advice on the purchase of equipment and supplies used at the plant, and to make himself available to deal with any important problems which arose. In return Mr. Martin received $3,333.33 per month plus reimbursement for necessary business expenses he incurred. His liability as consultant was limited to his willful misconduct or culpable negligence. Mr. Martin agreed not to disclose any trade secrets and that he would not compete with Creative Ceramics during the term of the Agreement.

The Agreement contains no anti-assignment clause. Indeed, the only reference to assignment contained in the Agreement is in the paragraph entitled "Parties Bound" which reads as follows: "This agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, legal representatives, successors, and assigns where permitted by this agreement."

### Positions of the Parties

Mr. Martin and the Trustee asserted that Barclays' perfection of its security interest in the Agreement constituted a preferential transfer under § 547. Mr. Martin claimed that Barclays' lien is invalid as an attempt to garnish or execute on current wages and, as such, violates Tex. Const., art. XVI, § 28 (1876, amended 1983) and Tex.Prop. Code Ann. § 42.002(8) (Vernon 1984).

Barclays' position is that the alleged transfer was not made on account of an antecedent debt. Therefore, it is not preferential pursuant to § 547. Additionally, Barclays asserted that the proceeds of the agreement in question did not constitute current wages because Debtor worked as an independent contractor.

### Exemption

█ The court first addresses whether the monies due to Mr. Martin under the Agreement are exempt as current wages for personal services. Exemption rights in bankruptcy are determined as of the date of the filing of the bankruptcy petition. *In re Connally*, 94 B.R. 908 (Bankr.W.D.Tex. 1989). Tex.Prop.Code Ann. § 42.002 (Vernon 1984) reads in pertinent part: "The following personal property is eligible for the exemption ... (8) current wages for personal services."

█ As early as 1931, Texas courts defined current wages as "compensation for personal services to be paid periodically or from time to time." *J.M. Radford Grocery Co. v. McKean*, 41 S.W.2d 639 (Tex.Civ. App.—Fort Worth 1931, no writ). More recently Texas courts defined "current wages" as used in § 42.002(8) of the Texas Property Code to be compensation due an employee in a master-servant relationship. This definition excludes monies received by an independent contractor. *See, Hennigan v. Hennigan*, 666 S.W.2d 322, 324 (Tex.Civ. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

In *Shahan v. Biggs and Co.*, 123 S.W.2d 686 (Tex.Civ.App.—Fort Worth 1939, no writ), the Fort Worth Court of Appeals held that a salesman who sold a corporation's oilfield tanks and separators for a commission on the price of goods sold where the orders were sent by him and accepted by the corporation, and the corporation did not tell him when or where to work or whom to see, was not an agent or

servant, but was an independent contractor, whose compensation was not exempt from garnishment under the Constitution and statutes.

An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right of control with respect to his physical conduct in performance of the undertaking. 44 Tex.Jur.3d *Independent Contractors* § 2 (1985) (citing *Johnson v. Claiborne*, 328 S.W.2d 215 (Tex.Civ.App.—Eastland 1959, writ ref'd n.r.e.)). Ordinarily, an independent contractor undertakes to perform a service with his own instrumentalities, according to his own means and methods, or according to a plan previously agreed on, without being subject to employer's orders or control with respect to the details of the work. *Id.* The relationship of the employer and independent contractor may be distinguished from that of employer and employee by the nature of the control exercisable over the work to be done and the person performing it. An independent contractor, unlike an employee or agent, is not under the immediate direction of the employer. In the case of an employer or principal, control extends to the manner of doing the work, and is more complete and detailed. *Id.* at § 3.

Some tests commonly applied to determine whether a person is an independent contractor are: (1) his right to control the progress of the work, except as to final results; (2) his obligation to furnish necessary tools, supplies, and material to perform the job; (3) the time for which he is employed; (4) the method of payment, whether by time or the job; (5) skill required for the performance of the work or the independent nature of his business; and (6) the freedom as to hours of labor. *Id.* at § 4. *See also Summers v. Skillern & Sons, Inc.*, 381 S.W.2d 352 (Tex.Civ.App. —Waco 1964, writ dism'd w.o.j.).

In the instant case, the agreement expressly provided that Mr. Martin is an independent contractor. No testimony was presented to show that the contract in any way was a sham. On the contrary, the testimony at the hearing showed that Mr. Martin supplied expertise on an as-needed basis. He testified that no one at Dal–Tile told him what hours to work, when to be in the office, where he must work and that he did not need to report to Dal–Tile the hours he worked per week or in any other time period. No federal or state withholding or social security was deducted from monies he received from Dal–Tile and he received no employee benefits from Dal–Tile.

The plant manager, Bill Merriman, testified that he determined when and where Mr. Martin performed his services. However, when he was asked, "Who determines how many hours he spends performing those services?", Merriman responded, "I tell him what the problem is. How many hours he puts in would be up to him. He may want to give it some thought overnight, or something like that." When asked, "Who sets time limits on resolution of these problems?", Merriman replied "No one." See Transcript at p. 36.

The court finds that Mr. Martin had the right to control his own work, that he was obliged to furnish his knowledge to perform the job, that he was paid for specific work, and that a high level of skill was required for his performance of the work. Therefore, the court concludes that Mr. Martin was an independent contractor. As such, the payments to which he is entitled are not exempt as current wages for personal services under the Texas Constitution and statutes.

### Property of the Estate

The court next turns to the issue of whether the monies due Mr. Martin under the Agreement are property of the estate. When the Debtors filed their bankruptcy petition, an estate was created under § 541. Property of the estate includes all legal or equitable interests of the debtor in property as of the commencement of the case including "[p]roceeds, product, offspring, rents, and or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case." § 541(a)(6).

The trend of recent decisions in the federal courts is to hold that future earnings are not property of the estate. *See, e.g., Tonry v. Hebert (In re Tonry)*, 724 F.2d 467 (5th Cir.1984) (holding that a contingent fee agreement of a debtor/attorney on which legal services remain to be performed is not property of the estate since the agreement is a non-assumable executory contract); *In re Haynes*, 679 F.2d 718 (7th Cir.), *cert. denied, Miller v. Haynes*, 459 U.S. 970, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982) (holding that military retirement pay is not property of the estate). *But see Rau v. Ryerson (In re Ryerson)*, 30 B.R. 541 (Bankr. 9th Cir.), *aff'd*, 739 F.2d 1423 (9th Cir.1984) (holding that termination pay which the debtor received upon discontinuing employment eight months after filing for bankruptcy is property of the estate.)

*In re Carrere*, 64 B.R. 156 (Bankr.C.D. Cal.1986) holds that postpetition earnings from a personal services contract are excluded from Chapter 7 and Chapter 11 estates and that a personal services contract is not property of the estate. *Id.* at 158–159 (citing *Ford, Bacon & Davis, Inc. v. M.A. Holahan*, 311 F.2d 901 (5th Cir.1962), *cert. denied, Holahan v. Ford, Bacon & Davis, Inc.*, 373 U.S. 913, 83 S.Ct. 1303, 10 L.Ed.2d 414 (1963), and *In re Noonan*, 17 B.R. 793 (Bankr.S.D.N.Y.1982)). *See also Norton v. Valley Bank of Nevada (In re Black and White)*, 68 B.R. 138 (Bankr.D. Nev.1986) (holding that the debtors' publishing agreement constituted a personal services contract and, thus, profits from their postpetition efforts were not property of the estate). The bankruptcy court concluded in a Chapter 11 case that in determining whether postpetition income was property of the estate or earnings of an individual debtor who was a surgeon and who did business as a sole proprietorship, the percentage of postpetition income representing return on fixed assets and services performed by associate surgeons would constitute property of the estate, while other income would constitute earnings of the individual debtor pursuant to § 541(a)(6). *In re Cooley*, 87 B.R. 432, 445 (Bankr.S.D. Tex.1988).

In *Calder v. Segal (In re Calder)*, 94 B.R. 200 (Bankr.D.Utah 1988), the court held that the postpetition wages and earnings of the Chapter 7 debtor, a bankruptcy attorney, were not property of the estate, but that prepetition wages and earnings which were unpaid at time of filing were included in the debtor's estate pursuant to § 541(a). *Id.* at 202.

Recently, the Fifth Circuit spoke on the issue of wages earned postpetition in *Clark v. First City Bank (In re Clark)*, 891 F.2d 111 (5th Cir.1989). In that case, the debtor was a football player with a guaranteed NFL player contract. Although the creditor argued that the debtor's postpetition salary was earned prior to the commencement of the case because it was guaranteed, the Fifth Circuit did not agree. The court looked at the overall contract and observed that the whole of the contract suggested the debtor had a continuing obligation to play for the team. In addition the contract provided for the incremental forgiveness, all through the season, of a loan the team made to the debtor which was to be forgiven provided he fulfilled his contractual obligation of playing for the team. Thus, the court held that the debtor earned his remaining salary postpetition and that it was not part of the bankruptcy estate.

There is a common thread running through all these cases. In each case, the debtor is a person with special skills. There is an actress, there are writers, there is a surgeon, there is a football player and, in the instant case, there is a ceramics engineer who is an expert on particular tile produced by a particular plant. In the instant case, Mr. Martin had an ongoing duty under the consulting contract which is analogous to that owed by debtors in personal services contracts cases. Therefore, the court concludes that the monies due Mr. Martin for postpetition services are not property of the bankruptcy estate pursuant to § 541(a)(6).

■ However, at the time he filed for bankruptcy Mr. Martin had a claim against Dal–Tile for services rendered but not paid

for because of Barclays' letter of March 23, 1989. That claim was clearly an interest of the debtor in property and, thus, it is property of the bankruptcy estate under § 541(a)(1).

### Validity of Assignment

█ Generally, in Texas all contracts are assignable unless the assignment is contrary to public policy or the contract involves a matter of trust and confidence. 7 Tex.Jur.3d *Assignments* § 4 (1980). If the contract is severable, the severable portions may be themselves assigned, and the right to assign is presumed where there is no prohibition against it in the contract. *Id.*

█ In personal service contracts there is a distinction between rights and duties. The duties may not be delegated without the consent of the other party to the contract. If the particular contract is personal in its character and calls for the personal services of either party or if it creates personalized relationships based on personal credit, confidence, and trust, or requires the exercise of knowledge, skill, or taste peculiar to either party, the duties under the contract may not be delegated (i.e. assigned) regardless of the skill or competence of the person to whom the duties are proposed to be delegated. *See, e.g., Southern Community Gas Co. v. Houston Natural Gas Corp.*, 197 S.W.2d 488 (Tex.Civ. App.—San Antonio 1946, writ ref'd). However, this does not prohibit assignment of the right to receive funds under the contract.

█ As a general rule, rights to salary or fees which have been earned may be assigned, and except as otherwise provided by statute, such an assignment is valid, and not in contravention of public policy. *See, e.g., Bates v. First State Bank in Caldwell*, 105 S.W.2d 784 (Tex.Civ.App.—Galveston 1937, writ dism'd). A contingent debt may be validly assigned as well as money, earnings, or profits to become due in the future or on the performance of an existing contract. *Lewis v. Oates*, 188 S.W.2d 895, 898 (Tex.Civ.App.—El Paso 1945) *aff'd*, 195 S.W.2d 123, 145 Tex. 77

(1946); *Beavers v. Consolidated Oil Co. of Texas*, 31 S.W.2d 876 (Tex.Civ.App.—Amarillo 1930, writ dism'd); *Southern Surety Co. v. Bering Mfg. Co.*, 295 S.W. 337 (Tex. Civ.App.—Galveston 1927, no writ). Such an assignment "may be made although the contract itself under which the money is to become due is not assignable, and although the interest to be assigned is of little value or may become forfeited." 6A C.J.S. Assignments § 23 (1975).

█ As between the parties, it is not essential that the fund assigned shall have been earned or be in existence at the time of the assignment, and it is sufficient that it has a potential existence, that there is a reasonable expectancy that the fund will be earned and come into existence. *Beavers, supra; King v. Hardin Lumber Co.*, 187 S.W. 401 (Tex.Civ.App.—El Paso 1916, no writ). In *Southern Surety Co., supra*, there was an agreement between a building contractor and his surety whereby the contractor conveyed and assigned to the surety, as security for an indebtedness which he might incur, all rights to payments due or to become due under the building contract with the owner. The court held that this was a valid assignment even though the fund was not in actual existence at the time of the agreement since it had a potential existence arising out of the contract, and came into actual existence by the completion of the contract.

█ It should be noted that both the *Restatement of Contracts* and *Corbin on Contracts* indicate that a contractual right can be assigned unless the assignment materially changes the duty of the obligor, or materially increases the burden or risk imposed on him by the contract, or materially impairs his chance of obtaining return performance. *Restatement (Second) of Contracts*, § 317(2)(a) (1981). *Corbin on Contracts*, §§ 868–69 (1951). In this case, the obligation is not changed. Dal–Tile is obligated to pay Mr. Martin's consulting fees so long as Mr. Martin provides consultation. The Agreement does not prevent assignment. Thus Mr. Martin could validly

assign future earnings from the Agreement to Barclays as security or otherwise.

### Preference

 The parties stipulated that all of the elements of a preference under § 547(b) were met except (b)(2) which requires that the transfer be "for or on account of an antecedent debt owed by the debtor before such transfer was made." Barclays agreed that the transfer occurred when Barclays filed its amended U.C.C.–1 financing statement on April 18, 1989 (90 days prior to the bankruptcy filing).

Mr. Martin executed a Continuing Guaranty of Martin Brick Company's indebtedness to Barclays. The only outstanding obligation of Martin Brick to Barclays is an equipment lease. Barclays asserted that at the time of the transfer (the filing of the U.C.C.–1 on April 18, 1989) Mr. Martin's obligation to Barclays had not "ripened" so there was no antecedent debt. However, a review of the documents shows that at the time of the transfer Barclays claimed that Mr. Martin had an obligation to it and that an obligation actually existed.

The August 26, 1983 lease agreement between Barclays and Martin Brick was a typical financing lease. Martin Brick contracted to purchase a sawdust fuel preparation, distribution and combustion system from Wagster, Walker, Thorn & Co., Inc. Instead of Martin Brick purchasing the equipment, Barclays purchased it and leased it to Martin Brick. Barclays made no warranties concerning the equipment. Barclays bore no risk of loss and all obligations for taxes, insurance, maintenance and repairs were on Martin Brick. Martin Brick had an option to purchase the equipment at the end of the lease at its fair market value at that time. In Paragraph 2 the lease provided "this Agreement may not be terminated by Lessor [Barclays] except as expressly provided herein, and unless otherwise provided, may not be terminated or canceled by Lessee [Martin Brick] for any reason whatsoever, including, without limitation, the failure of Lessor to perform its obligations under this Agreement." In Paragraph 3 the lease provided "the Lessee acknowledges and agrees that Lessee's obligation to pay all rentals and other amounts payable by the Lessee hereunder, and the rights of the Lessor in and to such rentals and other sums, shall be absolute and unconditional and shall be not subject to any abatement, reduction, setoff, defense, counterclaim or recoupment whatsoever". Paragraph 12 contains a broad indemnity clause whereby the Lessee indemnifies and holds the Lessor harmless from any and all damages in any way related to the equipment. Paragraph 21 gives the Lessor three remedies in the event of default; (1) acceleration of all rental payments and demand of the entire rental immediately, (2) payment of all delinquent rentals plus a "stipulated loss value" shown on the schedules of the lease which would insure the Lessor a profit in the transaction, or (3) surrender of the equipment, but in that event Lessee to pay any loss the Lessor suffers upon subsequent sale or re-lease of the equipment. Clearly, on the date of the lease, Martin Brick was obligated to pay the full rentals described under the lease. On August 26, 1983 (the same date as the lease) Mr. Martin and his wife signed a Continuing Guaranty to Barclays in which they "jointly and severally and unconditionally guarantee to Barclays and its successors and assigns the prompt payment in full when due and at all times thereafter (waiving notice of non-payment) of any and all rentals, indebtednesses, obligations and liabilities of any kind or nature now or at any time hereafter owing to [Barclays] by [Martin Brick]." Thus, at the time of its execution, the Continuing Guaranty created an obligation to pay the full rentals due under the lease. Mr. Martin had an obligation to Barclays on August 26, 1983 and the transfer made April 18, 1989 was to secure that antecedent debt.

On August 26, 1983 Mr. Martin granted a security agreement to Barclays as security for the Continuing Guaranty. The collateral consisted of Mr. Martin's rights under the June 7, 1983 Agreement between Creative Ceramics Corporation and Mr. Martin. The security agreement was to secure all of Mr. Martin's obligations to Barclays under the Continuing Guaranty

and all other obligations which Mr. Martin might have to Barclays.

Clearly Barclays felt that Mr. Martin was obligated to it on March 23, 1989 (approximately three weeks before the transfer) because by letter of that date W.D. Thompson, Vice–President of Barclays, notified Creative Ceramics that Mr. Martin was in default on the Continuing Guaranty and requested "that all future monies due to Lang C. Martin, Jr. under the Consulting Agreement be remitted directly to BarclaysAmerican/Leasing, Inc." Barclays now asserts that there really wasn't any obligation at that time because it used the proceeds of a letter of credit which was also given as security for the lease to pay the rentals which were due. Barclays cannot be allowed to "refigure" obligations in a way which contradicts its own demands.

"Although 'antecedent' debt is not defined by the Bankruptcy Code, essentially a debt is antecedent if it is incurred before the transfer ... [and] ... a debt is incurred when a debtor becomes legally bound to pay." *Four Winds Enterprises, Inc. v. First National Bank (In re Four Winds Enterprises, Inc.)*, 94 B.R. 694, 696 (Bankr.S.D.Cal.1988). *See also Nolden v. Van Dyke Seed Co. (In re Gold Coast Seed Co.)*, 751 F.2d 1118 (9th Cir.1985). Martin Brick was legally bound to pay all rentals under the lease at the time the lease was signed on August 26, 1983. When Mr. Martin signed the Continuing Guaranty on August 26, 1983 he was also bound individually to pay all rentals under the lease.

Barclays cites *Bernstein v. RJL Leasing (In re White River Corp.)*, 799 F.2d 631 (10th Cir.1986) for the proposition that the total lease obligation was not due when the lease was signed—it was only due and payable as the lease term progressed. The *White River* Court pointed out that the lease agreement in that case provided for a security deposit of $23,000.00 and a monthly rent of $23,000.00 to be paid on the 15th day of each month, but gave no indication that the lease was a financing lease of the type used by Barclays in this case. The court in *White River* cited with approval *Carmack v. Zell (In re Mindy's, Inc.)*, 17 B.R. 177 (Bankr.S.D.Ohio 1982) which is likewise distinguishable because it related to leases of real property used in connection with the debtor's retail business.

## CONCLUSION

For the reasons stated above the court finds:

1. Amounts accrued but unpaid to Mr. Martin by Dal–Tile for consulting work done by Mr. Martin pre-petition are property of the bankruptcy estate and should be turned over to the Trustee. Barclays' asserted lien on such funds is a preference which may properly be avoided by the Trustee.

2. Amounts owed by Dal–Tile to Mr. Martin for post-petition consulting work are not property of the bankruptcy estate and are not exempt as wages. Barclays has a valid lien on those amounts.

ORDER ACCORDINGLY.*

---

* This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.